**Joseph P. GALDA, et al., Plaintiffs,**

v.

**RUTGERS, the State University of New Jersey, et al., Defendants,**

**New Jersey Public Interest Research Group, Inc., Defendant-Intervenor.**

**Civ. A. No. 79–2811.**

United States District Court, D. New Jersey.

June 20, 1984.

As Corrected July 11, 1984.

---

Bradford S. Smith, Cinnaminson, N.J. and Myrna P. Field, Joseph W. Marshall, III, Mid-Atlantic Legal Foundation, Philadelphia, Pa., for Joseph P. Galda, Paul Ewert, Kristina Farrow Cypel, Thomas H. Odom, Joseph Randall Corman, Lori Keeley, Leslie Beebe, Leonard Scott Kelter, Edward D. Wickham and Christopher Lepre.

Gregory B. Reilly, Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, Roseland, N.J., for defendants Rutgers, The State University of New Jersey, Dr. Edward J. Bloustein, Individually, and as President of Rutgers, The State University, Dr. Norman Reitman, Individually, and as Chairman of the Board of Governors of Rutgers, The State University, Donald S. McNaughton, David A. Werblin, Katherine Elkus White, Donald M. Dickerson, San-

ford M. Jaffe, Robert Kaplan, Edward Kramer, Linda Stamato, Robert J. Torricelli, Mary White Bell, as members of the Board of Governors of Rutgers, The State University of New Jersey, and Walter K. Gordon, Individually and as Dean of Rutgers Camden College of Arts and Sciences.

James Lanard, Trenton, N.J. and John Cary Sims, David C. Vladeck, Washington, D.C., for defendant-intervenor New Jersey Public Interest Research Group, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

This action is brought by nine students at Rutgers, The State University of New Jersey ("Rutgers"), challenging the constitutionality of the current funding system at Rutgers of the New Jersey Public Interest Research Group, Inc. ("PIRG"). Plaintiffs allege that their First and Fourteenth Amendment rights are violated by the exaction of a refundable fee by the University to support PIRG. After conducting an extensive nonjury trial the court finds that plaintiffs have failed to rebut the presumptive validity of the University's judgment that PIRG contributes educationally to the university community. The court therefore finds that plaintiffs have failed to make out a prima facie case that the exaction of the fee conflicts with the mandates of the First Amendment.

## BACKGROUND

This action was originally instituted in September 1979 by three students enrolled at Rutgers Camden College of Arts and Sciences. The plaintiffs filed suit against Rutgers under 42 U.S.C. § 1983, alleging that university officers and administrators were violating plaintiffs' rights under the First Amendment[1] by exacting with each semester's bill a refundable fee to support

---

**1.** The First Amendment is applicable to state action by way of its incorporation through the Fourteenth Amendment. *See Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). For ease of discussion, the court will refer to the First Amendment in this opinion with the understanding that it is applicable only through its incorporation into the Fourteenth Amendment.

PIRG, a non-profit, non-partisan, student-run corporation engaged in research, lobbying and advocacy for social change.

In 1981, this court granted defendants' motion for summary judgment. *Galda v. Bloustein,* 516 F.Supp. 1142 (D.N.J.1981). It found, *inter alia,* that the presence of a refund procedure for students not wishing to support PIRG preserved the constitutionality of the funding policy. The plaintiffs appealed this decision.

On appeal, the Third Circuit Court of Appeals reversed this court's grant of summary judgment and remanded the case for a trial. *Galda v. Bloustein,* 686 F.2d 159 (3rd Cir.1982). The Third Circuit reasoned that on the record before it there existed a genuine issue of material fact as to whether the exaction of the PIRG fee infringed upon the plaintiffs' constitutional rights. 686 F.2d at 165. The court initially noted that Rutgers had determined that PIRG was educationally valuable and stressed that "considerable deference" must be accorded to the University's determination that "an organization [such as PIRG] is an appropriate participant in the total university forum." *Id.* at 166.[2] The circuit court held, however, that the University's judgment about the educational value of PIRG to the university community was not absolutely immune from judicial scrutiny. The court ruled that a more complete factual record was needed as to the nature of PIRG and its contribution to the university forum and outlined the following test:

To overcome the presumptive validity of the university's judgment that an organization contributes to the university community, and to make out a prima facie case that exaction of the fee conflicts with the mandates of the first amendment, persons objecting to the fee must establish that the challenged group functions essentially as a political action group with only an incidental educational component. At that point the burden of producing evidence to counter the plaintiffs' showing or to otherwise demonstrate a compelling state interest shifts to the university. We do not rule out the possibility that, even in the face of an unrebutted prima facie showing, the university might demonstrate a compelling state interest by establishing the importance of the challenged groups contribution to the university forum.

*Id.* at 166–67.[3] The circuit court ordered a remand because this court "did not have an opportunity to evaluate the plaintiffs' showing against the standards we have enunciated nor did the university have the opportunity to counter the plaintiffs' showing or otherwise set forth a compelling state interest." *Id.* at 167.

Pursuant to the mandate on remand, this court conducted a ten-day trial at which past and present members of the Rutgers community appeared and testified about PIRG and its contributions to Rutgers. Dr. Edward Bloustein, President of Rutgers, testified at length about the creating of the funding mechanism of PIRG and his view of PIRG's contribution to the universi-

---

**2.** The court went on to state that
    This deference stems from the long-standing recognition that the university as a whole functions as a forum for the exchange of diverse views. As the Supreme Court has observed, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981). The holdings in [*Veed v. Schwartzkopf,* 353 F.Supp. 149 (D.Neb.), *aff'd mem.,* 478 F.2d 1407 (8th Cir.1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974) ] and [*Arrington v. Taylor,* 380 F.Supp. 1348 (M.D. N.C.1974), *aff'd mem.,* 526 F.2d 587 (4th Cir.

1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976) ] thus correctly indicate that the university has broad latitude in providing an opportunity for students to participate in—and to oppose—expression of a broad spectrum of ideology.
    *Galda, supra,* 686 F.2d at 166 (footnote omitted). *Accord, Kania v. Fordham,* 702 F.2d 475 (4th Cir.1983) (courts should defer to the academic judgments of university administrators).

**3.** The court also ruled that a refund to dissenters would not in itself preserve the constitutionality of the funding mechanism if the initial payment of the fee violated plaintiffs' constitutional rights. *Galda, supra,* 686 F.2d at 167–69.

ty community. Eminent experts in political science, education and university administration appeared and testified about PIRG at Rutgers and about the PIRGs at other institutions of higher learning around the country.

The court's findings focus on the creation and nature of the current funding mechanism for PIRG at Rutgers; the organizational structure of PIRG; the scope of PIRG's activities; the experiences of Rutgers faculty and students with PIRG; and the opinions of experts about the educational value of PIRG and its contribution to the university community. The court does *not* attempt to restate all of the information presented at trial, but instead focuses on the framework discussed above to reach a reasoned conclusion as to whether plaintiffs' constitutional rights have been violated by defendants' actions.

## FINDINGS OF FACT

### A. The Parties

1. The plaintiffs in this action are nine individual students at the various constituent campuses of Rutgers, the State University of New Jersey. The parties have stipulated that each plaintiff finds positions taken by PIRG objectionable [4] (Joint Stipulation ("Stipulation") 3). Each plaintiff paid the refundable PIRG fee for one or more semesters during which he or she was a student at Rutgers (Stipulation 2).

2. This suit was filed naming as defendants officers and administrators of Rutgers. For purposes of this action only, the parties have agreed that action taken by Rutgers is state action (Stipulation 5). Shortly after the lawsuit was filed, PIRG intervened as a defendant and has since then actively participated as a party in this case.

### B. The Creation of the Special Funding System at Rutgers

3. The overwhelming majority of student organizations at Rutgers are funded through a mandatory, non-refundable student activities fee assessed against students each semester (Joint Exhibit ("Exhibit") 379; (Tr. VI, 30–33)). The apportionment of this student activities fee for student organizations is determined by a relatively small group of students on a student fee board (Tr. VI, 46). Students in general have no opportunity to vote on the specific apportionment of this mandatory fee among student groups at Rutgers (Tr. VI, 45–47).

4. Many of the student organizations funded through the mandatory, non-refundable student activities fee take positions on political and social issues (Tr. VI, 32–33). Such groups include the American Civil Liberties Union, the Jewish Awareness Club, the National Association for the Advancement of Colored People and the Gay Alliance, an organization which advocates the rights of homosexuals (Tr. I, 48; Tr. V, 70–72; Tr. VI, 33–35; Exhibit 379). Also funded through the non-refundable student activities fee is the Rutgers University Legislative Action Committee ("RULAC"), a group which takes positions on issues of social importance and lobbies to further its positions before legislators in Trenton, New Jersey and Washington, D.C. (Tr. VI, 69–71). Rutgers further allows student groups such as the College Republicans to use the facilities of the University (Tr. I, 148–49).

5. Dr. Edward Bloustein, the President of Rutgers and an expert in college level education and university administration, strongly supports the presence of these groups of the campuses of Rutgers because they create the "widest possible forum for the interchange of views in the University community" (Tr. VI, 37).[5]

---

**4.** The court notes, however, that only two of the seven plaintiffs who appeared and testified at trial named positions taken by PIRG with which they disagreed (Tr. I, 82, 122). One of the other five plaintiffs who appeared quite candidly testified that she became a plaintiff in this action at the request of plaintiff Joseph Galda and does

not know any positions taken by PIRG (Tr. I, 86–87).

**5.** Dr. Bloustein further testified as follows:

I know of no university which doesn't have such a system of clubs and activities and I know of none of my colleagues, and I meet

6. In 1971 a group of students approached Dr. Bloustein and asked him to create a new funding mechanism to support a public interest research group (a "PIRG") at Rutgers (Tr. VI, 17; Exhibits 6, 169, 170). The students had collected thousands of signatures on petitions in support of their proposal (Tr. VI, 116–25). Under the students' proposal, the University would assess a refundable fee of $1.50 to support the proposed PIRG with each semester's tuition bill (Exhibit 6). The PIRG proposed by the students was ineligible for funding from the general student activities fee because it was to be a student-run corporation independent of the University (Tr. VI, 88).

7. Under the students' proposal, PIRG was to be a non-partisan, non-profit corporation which would research and lobby for social change (Exhibit 6). Similar proposals for PIRGs were introduced in the early 1970s in other universities around the country (Tr. VI, 174 (University of Minnesota); Tr. VII, 89–93 (University of Massachusetts); Tr. X, 86 (Queens College); Tr. X, 94 (Bennington College)).

8. PIRGs were initially welcomed by university administrators among other reasons because they were a vehicle for students to develop and further their political and social beliefs in a socially acceptable manner (Tr. VI, 23; Tr. VII, 92–93; Tr. X, 89). PIRGs developed nationally shortly after the height of student unrest stemming from American involvement in the Vietnam war (Tr. VII, 92–93). The proposed structure of PIRGs was suggested by Ralph Nader and Donald Ross in their book "Action For a Change," published in 1972 (Exhibit 165; Tr. VI, 22–23).

9. As noted above (Finding No. 6), the students' proposal to Dr. Bloustein was for a specialized funding procedure which would be unique for PIRG (see Exhibits 6, 169). The Rutgers administration rejected the students' proposal, reasoning (a) that the University administration did not directly authorize funds for any specific student activity (Tr. VI, 18); and (b) because it believed that a broad and neutral funding policy for groups outside the mandatory student activities fee would better encourage a broad forum for the expression of diverse student viewpoints (Id.).

10. The Rutgers University Board of Governors ultimately enacted such a neutral funding policy, which was originally proposed by Dr. Bloustein (Tr. VI, 18) and is set forth in the margin in its entirety as amended in 1973.[6] Two key eligibility requirements were established by the University in its neutral funding policy.

them regularly, who would not say that this is a very strong adjunct of the success of any university. Indeed, I have been a student at [at] least four universities in my time, from Oxford University to Cornell to N.Y.U. I've taught in one or two others. In every one that I have been near, student activities of this sort are considered valuable adjunct to the educational experience. (Tr. VI, 37).

6. The funding policy provides as follows:

The following is a statement of University policy regarding the funding of student sponsored programs and organizations which are not legally eligible to receive funds from student activity fee accounts:

(1) Each organization is required to present its program and plans for concept review to the University Senate for recommendation to the President.

(2) If approved, the organization shall seek college referenda on the issue of student funding support for their program. At least fifty per cent of the student body of each division of the University shall be required to participate in such referenda and a majority of those voting must approve the project in order for implementation within that division. As an alternate, an affirmative vote of twenty-five per cent of the student body plus one shall be adequate to meet this test.

(3) The organization shall then be listed on the University term bill with payment of the indicated fee mandatory. A postcard asking for a refund shall be included along with the term bill which shall be sent by the individual student to the organization and which shall send the refund directly to the student.

(4) Each organization so funded shall be expected to defray the University cost of administration of the fee collection.

(5) Each organization shall be required every three years to meet the tests defined under items #1 and #2 above in order to continue to receive funds under this policy and procedure.

a. The activity funded must have significant educational value. The educational value of any proposed activity is scrutinized by the University President and by the University Senate, an advisory body composed of administrators, faculty and students (Tr. VI, 12). Any group hoping to be funded through the neutral funding policy must present a "concept plan" to the President and University Senate at the time the proposal is initially made and every three years thereafter, if funding is approved.

b. After the concept plan is approved for its educational value, the organization seeking funding must demonstrate widespread student support by attaining a minimum affirmative vote of 25% plus one of all students eligible to vote. PIRG must also receive a majority of those actually voting. Referenda must be held every three years after initial approval of funding is approved by the students. At each referendum, students are free to campaign for and against the groups seeking to participate in the special funding program (Tr. IX, 67–69). Twenty-five percent of the student body was viewed as an extremely stringent requirement, as the general turnout at student elections at Rutgers is only ten to fifteen percent of the student body (Tr. VI, 24).

11. The Senate Education Policy Planning Committee endorsed the neutral funding mechanism described above. It felt that the funding system and its operation in practice would be a valuable adjunct to the educational opportunities available at Rutgers (Tr. VI, 20–21). Dr. Bloustein concurred with this judgment at the time the policy was passed by the University and reiterated his belief at trial that the funding mechanism in itself is educational (Tr. VI, 22–24, 45–47).

12. The University's position about the educational value of the neutral funding system is based on several considerations:

a. The funding procedure requires the funded group to regularly "meet its constituency" to seek their approval through the periodic referenda (Tr. VI, 23). Dr. Bloustein believes there is "great educational value" in the process of having students publicly campaign to win the support of fellow students whom they purport to represent (Tr. VI, 23–24). The experience of advocating one's position in the referendum process forces proponents of PIRG to learn their opponents' arguments in order to rebut them, in itself an educational introduction to the political process (Tr. VI, 45, 57).

b. The referendum procedure encourages diversity at Rutgers, since it provides a freer forum for a wider expression of student opinion than the student fee boards used to disperse the mandatory student activities fee (Tr. VI, 46). The process is more "democratic" than the existing funding of student activities (Tr. VI, 47), in that it broadens the range of organizations funded with student fees (Tr. VI, 46–47). Moreover, the funding procedure is controlled by the general student population and is therefore independent of the sometimes acrimonious disputes of the student fee board as to the appropriate disbursement of student fees (Tr. VI, 49).

13. Following the enactment of the neutral funding mechanism by the Rutgers Board of Governors, PIRG campaigned for and won student referenda at several Rutgers campuses (Exhibit 17). PIRG has operated continuously at Rutgers since 1972, essentially supported by the refundable student fee (Stipulation 8; Tr. III, 170). Rutgers has facilitated the collection and transfer to PIRG of a total of over $800,000 over the past twelve years (Tr. II, 109).

14. The PIRG fee was originally $1.50 per semester per student. The fee approved in the most recent student referenda is $3.50 per semester (Stipulation 12). PIRG has complied with the requirements of the University's funding policy by submitting a "concept plan" and winning the approval of the university administration every three years since 1972 (Tr. VI, 54; Exhibit 171 (1975); Exhibit 178 (1978); Exhibit 184 (1981)). Rutgers President Blou-

stein firmly believes that PIRG has a valuable educational purpose and functions only incidentally as a political group (Tr. VI, 54–55, 66–68).

15. The special funding policy is neutral and is not limited to the funding of PIRG. *The Daily Targum*, the undergraduate newspaper at Rutgers' New Brunswick campus, has obtained student fees pursuant to the funding policy since 1980 (Stipulation 11; Tr. IX, 71). The *Targum* takes editorial positions on political issues (Tr. VI, 48–49) and endorses candidates running for elective public office (Tr. VI, 49–52).

16. PIRG generally wins overwhelming margins in the funding referenda, sometimes as much as 90% of the votes cast (Tr. IX, 67); Exhibit 393 (referenda results collected)). At the time of trial, PIRG fees were being collected from students at the following constituent campuses of Rutgers: Cook College, Douglass College, Rutgers Law School/Camden, Rutgers Law School/Newark, and Rutgers College at New Brunswick (Tr. IX, 94). PIRG fee referenda have recently failed to attain the minimum vote required for funding at Rutgers' other two campuses, Livingston College and the Rutgers Camden College of Arts and Sciences (Tr. IX, 64–65). The defendants have informed the court that after the trial in this action a PIRG referendum passed in the Spring of 1984 at Livingston College, leaving Rutgers-Camden as the only Rutgers campus where students have not approved the funding mechanism for PIRG (Galligan Affidavit, ¶¶ 4–5).

17. The refundable student fee for PIRG is named as a separate line item on students' bills each semester (Exhibits 1, 2 and 3). Rutgers describes the fee as mandatory (Stipulation 6), but does not sanction students who refuse to pay the fee (Tr. VI, 27; Tr. IX, 77). Approximately three to five percent of the students who have paid the PIRG fee request a refund from the University of their PIRG fee (Tr. IX, 81).

18. A leaflet that describes PIRG, its activities and the refund procedure is enclosed with each term bill (Stipulation 13; Exhibit 4). The back of that leaflet contains a form which those students desiring a refund must complete and submit to PIRG (Stipulation 14). PIRG staff members keep confidential the names of those students seeking refunds of their PIRG fees (Tr. IX, 85). The refund form does not ask for any explanation or statement or reasons for the refund request (Stipulation 15). No plaintiff is aware of any incident in which any Rutgers student has been discouraged by Rutgers, by PIRG, or by any other person or organization, from requesting a refund of the PIRG fee (Stipulation 16). No plaintiff is aware of any incident in which any Rutgers student has been subjected to any type of reprisal or punishment for requesting or receiving a refund of the PIRG fee (Supplemental Stipulation).

19. When PIRG receives the refund forms, it contacts Rutgers to determine whether the students seeking refunds have in fact paid the PIRG fee (Tr. IX, 76). After PIRG receives this verification from Rutgers, it sends out refund checks to the students who have requested them (Tr. IX, 78). Refunds are generally sent out in the latter part of the semester in which students have paid the fee (Tr. IX, 76–80).

20. At the beginning of each semester, Rutgers pays an advance to PIRG up to ninety percent of the funds collected for PIRG from students upon registration (Tr. IX, 79). The University deducts from the amount sent to PIRG its expenses in administering the funding system, which ranges from $2,000—$3,000 per semester (Tr. IX, 80). At the end of each semester, Rutgers pays PIRG the balance of the PIRG fees collected for which no refunds were given (Tr. IX, 79). Students who have requested and received refunds of their PIRG fees are still free to participate in the activities of PIRG (Tr. IX, 75).

## C. The Organizational Structure of PIRG

21. PIRG is governed by students elected by their peers to serve as members of PIRG boards of directors at the local (cam-

**486**

pus) and state levels (Tr. V, 167; Exhibit 94 (organizational flowchart of PIRG)). The local boards of directors are responsible for PIRG activities on each constituent campus of Rutgers (*Id.;* Tr. IX, 12–13). Local board members elect the members of the state board of PIRG which ultimately governs the organization, sets policy and chooses the projects and activities in which PIRG becomes involved (Tr. V, 167; Tr. VIII, 61–68). The representation of each Rutgers campus on the PIRG state Board of Directors is proportionate to the relative sizes of the constituent campuses (Tr. V, 167–68).

22. The PIRG state Board of Directors, composed entirely of students, elects one of its members to serve as the state chairperson of PIRG (Tr. VIII, 61). The chairperson, among other duties, runs monthly meetings, oversees the PIRG support staff, proposes agendas, and supervises numerous PIRG committees, which include a hiring committee, a projects committee and a finance committee (Tr. VIII, 63). He or she acts as the liaison from PIRG to other groups and organizations within the University and as a general spokesperson for PIRG (Tr. VIII, 81).

23. The state Board of Directors is solely responsible for the selection of PIRG's activities (Tr. VIII, 64, 68). Any student at Rutgers, whether or not active in PIRG, may submit suggested projects for PIRG to the consideration of PIRG's board of directors (Tr. VIII, 63). Among the factors relied upon by the students in selecting projects for PIRG are (a) whether there is adequate student interest in the proposed project; (b) whether the resources of PIRG could support the project; (c) whether PIRG staff members or students had expertise in the area; (d) what sort of end result would arise from the project (e.g., a pamphlet or publication); (e) the amount of time a project would consume; and (f) the need in the community for the project (Tr. VIII, 64). The projects and positions of PIRG are selected annually by the students governing the organization (Tr. VI, 113: "We are not bound by what was done in previous years nor do we bind the next

State Board" (Angela Dileo, former PIRG chairperson)).

24. The PIRG board of directors has the responsibility of hiring and firing the executive director of PIRG (Tr. V, 177). The executive director is selected by the state Board of Directors after applicants are interviewed and screened by a Hiring Committee composed of members of the board (Tr. V, 179–80).

25. The executive director of PIRG is the salaried supervisor of the PIRG staff who oversees PIRG's activities on a day-to-day basis (Tr. V, 177–78). In addition to the executive director, who is a full-time employee of PIRG, there are six other full-time employees and one part-time employee of the organization who work with Rutgers students to implement PIRG policies and supervise PIRG internships (Tr. V, 183). These other employees include coordinators of PIRG activities on the constituent campuses, an administrative director, a part-time attorney and an outreach director who coordinates PIRG's relations with citizens in the community (Tr. V, 183–84). PIRG's organizational structure is detailed in Exhibit 94 (*see also* Tr. IX, 19–20).

26. Students active in the governance of PIRG testified that their governance activities and responsibilities have in themselves been educational, in that they learn leadership and organizational skills, group dynamics and communications skills, technical writing and public speaking (Tr. V, 186; Tr. VIII, 68–69; Tr. IX, 14). One former PIRG leader emphasized that PIRG activities helped her develop feelings about the importance of citizenship and an individual's responsibility to contribute to society (Tr. V, 187).

27. The paid staff of PIRG advise the students and assist in the development and execution of PIRG projects, but exercise no vote on the PIRG boards of directors (Tr. V, 168–74; Tr. IX, 18, 25).

28. For several years of its existence, ending in July 1981, PIRG employed a legislative director to lobby in support of positions taken by the PIRG state Board of

Directors (Tr. IX, 21, 44). PIRG does not currently employ a legislative director (Tr. IX, 21).

29. PIRG's activities are predominantly undertaken by student interns at the constituent campuses of Rutgers (Tr. IX, 23). Many students choose to intern at PIRG for academic credit or in conjunction with their classwork (Tr. IX, 23–24; *see also infra* Finding No. 36). Other students volunteer their time to assist with PIRG projects (Tr. IX, 25). Hundreds of students at Rutgers have participated in PIRG's activities (Tr. VIII, 11; Tr. IX, 23–24; Exhibit 182 at pp. 22–27).

30. Those students interning with PIRG for academic credit can arrange for such credit by designing a research project and asking a member of the Rutgers faculty to approve and supervise their activities (Tr. IX, 24). Individual faculty members decide what individual work is to be required of PIRG interns, and faculty members award grades to the students at the conclusions of their internships (Tr. VII, 157–59; Tr. VIII, 44). PIRG staff members communicate with the supervising faculty members in order to inform the faculty of the activities of their students who are working with PIRG (Tr. VII, 162–63). PIRG staff members meet with PIRG interns on at least a weekly basis and provide faculty members with evaluations of the students' work at PIRG (Tr. IX, 24).

## D. The Scope of PIRG's Activities

31. PIRG's goals are as follows:

a. to engage in non-partisan analysis, study and research of such issues as urban revitalization, consumer protection, resource planning, urban and rural occupational safety and labor conditions, protection of natural areas and environmental quality, racial and sexual discrimination, landlord-tenant relations, delivery of health care and similar matters of urgent or long-range concern to the general welfare of the people of the State of New Jersey.

b. to make available to the public at all times a full and fair exposition of the pertinent facts and results of such non-partisan analysis, study and research so that citizens may form independent conclusions beneficial to the community. Exhibit 91 (PIRG's Articles of Incorporation).

32. As noted above (Finding No. 23), the activities undertaken by PIRG are individually selected by the PIRG state Board of Directors, consisting entirely of students from the constituent campuses of Rutgers. Copious evidence in the form of exhibits and testimony was introduced at trial about the scope of PIRG's activities.

33. The following Findings describe PIRG's activities at Rutgers. This is not by any means an exhaustive statement of those activities, but is an accurate reflection of the breadth of the projects undertaken by PIRG in recent years.

a. PIRG sponsors debates, lectures and public fora on matters of public interest and concern (Tr. V, 57; Tr. IX, 25). The subjects of these functions have included such issues as education and tuition policy (Tr. IX, 27), decision making in the energy field (Tr. IX, 26), and the Equal Rights Amendment (Tr. V, 160).

b. Students and staff at PIRG have written, published and disseminated informational pamphlets and consumer guides on a wide variety of topics (Tr. IX, 27). These have included publications on the competency and honesty of local service stations (Exhibit 399), financial aid (Exhibit 402), tenants' rights (Exhibit 403), the transportation system at the New Brunswick campus of Rutgers (Exhibit 404), the Federal Water Pollution Control Act (Exhibit 409), banking services in New Brunswick (Exhibit 410), hospital emergency rooms and squads (Exhibit 412), general consumer guides (Exhibits 413 and 415), solar energy (Exhibit 414) and fuel costs (Exhibit 419). These exhibits represent only those PIRG research projects that have ultimately resulted in formal published pamphlets and guides. Other research papers done by students working with PIRG include reports on such topics as

higher education, water conservation and New Jersey's oil spill program (Tr. IX, 40–41).

c. PIRG's single largest project at Rutgers has been the Clean Water Action Project, which constitutes approximately forty percent of PIRG's work at Rutgers (Tr. IX, 30–31). There exists a strong interest at PIRG in environmental matters partly because Cook College, one of Rutgers' constituent campuses, emphasizes environmental studies, and also because New Jersey itself often faces serious environmental problems (Tr. IX, 31). A major component of the Clean Water Action Project is "streamwalking," a program wherein PIRG students wade in boots through streams attempting through scientific testing to discover hidden illegal sources of pollution into New Jersey's fresh water systems (Tr. V, 152–53; Tr. VII, 63–64; Exhibits 327–31). PIRG students frequently find such illicit pollution discharge points (Tr. VII, 64), mark the spot on a regional map, and notify the United States Environmental Protection Agency of the violations (Tr. VII, 63).

d. Another major area of involvement for PIRG is consumer protection (Tr. IX, 31; e.g., Exhibit 413). PIRG has published many consumer informational pamphlets, ran a consumer hotline and published a directory of social services (Tr. IX, 31–32).

e. Some other major areas of PIRG's work include energy conservation (Tr. IX, 33–34; Exhibits 417–18), tuition policy and financial aid (Tr. IX, 34), tenant's rights (Tr. IX, 35) and women's rights (Id.).

f. PIRG staff and students sometimes publicly lobby to further the positions taken by the PIRG board of directors (Tr. III, 162–63; VI, 110–11; Tr. IX, 27–28, 49). PIRG staff and students have lobbied individual state legislators and appeared and testified before legislative committees in Trenton, New Jersey (Tr. IX, 49–50). Edward Lloyd, the executive director of PIRG from 1978 through 1983 estimates that he spent at most about fifteen percent of his time in legislative activities (Tr. IX, 45–46).[7] PIRG's campus coordinators also occasionally lobby to further the positions taken by PIRG (Tr. IX, 48). PIRG's staff attorney has sometimes represented PIRG in litigation assisted by Rutgers law students in clinical programs or internships (Tr. IX, 28).

g. PIRG has sometimes lobbied in coalition with other student groups on issues of common interest (Tr. IX, 50–52). The other groups include the Rutgers University Legislative Action Committee and the New Jersey Student's Association, groups funded by Rutgers students through the mandatory, non-refundable student activities fee (Tr. IX, 52). PIRG sometimes takes positions opposed to the positions taken by Rutgers (Tr. IX, 53).

34. The plaintiffs in this action retained Irving B. Ross, a certified public accountant, to analyze PIRG's financial records (Tr. II, 71–179). After reviewing those records in detail, he was unable to quantify the expenditures of PIRG in terms of "political" expenditures and "educational" expenditures (Tr. II, 80). He could not do so because PIRG's financial documents did not break down its activities into these categories, and the underlying records of the organization did not contain data adequate for him to make such a distinction (Tr. II, 79–109). The court's independent review of PIRG's financial documents confirms that it is impossible from these records to numerically quantify "political" and "educational" components of PIRG (e.g., Exhibits 100–161).

7. The court notes the testimony of Harold Bozarth, a chemical industry lobbyist who testified that Mr. Lloyd attends legislative sessions nearly every day when the legislature is in session (Tr. II, 16). Lloyd was asked about Bozarth's testimony (Tr. IX, 46). He explained that PIRG and the chemical industry took adverse positions on a recently enacted "right to know" bill affecting the chemical industry (Id.). Lloyd speculated that since he and Bozarth frequented the same legislative committee meetings for that bill, Bozarth was under the mistaken impression that Lloyd was constantly in attendance at the state legislature (Id.).

## E. The Experiences with PIRG of Rutgers Faculty and Students

35. At trial past and present Rutgers faculty and students appeared to testify about their experiences with PIRG, and about whether they believe that PIRG contributes educationally to the university community and whether it specifically contributed to their educational experiences at Rutgers. All of these witnesses, whose testimony is briefly summarized below, were called by the defendants. The plaintiffs called no Rutgers faculty or students to rebut the testimony of these witnesses that PIRG's presence at Rutgers significantly enhances the educational opportunities available to faculty and students at the University.

36. The past and present Rutgers students who testified included both students who held leadership positions within PIRG and those who were more casually involved in the organization, primarily as interns working under the auspices of a member of the Rutgers faculty. These students testified that they have derived significant educational benefits from their association with PIRG.

a. Angela Dileo is currently a senior at Rutgers College (Tr. V, 159). She has participated in three Rutgers internships, including a study of the way New Jersey was handling its oil pollution problems in comparison with seven other states (Tr. V, 161), an extensive project which lasted nine or ten months (Tr. V, 164). She testified that working with PIRG improved her organizational and writing skills, taught her to deal with a bureaucracy, to use a law library and about oil pollution, the subject matter of her internship (Tr. V, 164–65). She also served as a member of the local and state PIRG boards of directors and has recently completed a term as the chairperson of PIRG's state Board of Directors (Tr. V, 171). She testified that her leadership roles in PIRG have in themselves been educationally valuable, teaching her organizational and analytical skills, technical writing, public speaking and the importance of citizenship and participation in public life (Tr. V, 186–87).

b. William Potter is a 1973 graduate of Rutgers Law School in Newark (Tr. VI, 116) and is currently the Assistant Commissioner of the Department of the Public Advocate of New Jersey (Tr. VI, 114). He was active in the formation of PIRG and the presentation of the original funding proposal to the Rutgers administration (Tr. VI, 118–36). He testified that his experience with PIRG helped him choose a public service career, introduced him to legal advocacy, and taught him to effectively advocate his positions in writing (Tr. VI, 138).

c. Janine Beer is a 1983 graduate of Rutgers College who served as state chairman of PIRG while she was an undergraduate (Tr. VIII, 61). Her experience with PIRG taught her organizational and administrative skills, developed her public speaking skills, and introduced her to the substantive areas which were the subjects of her research at PIRG (Tr. VIII, 69).

d. John Malleck is a 1976 graduate of Rutgers who was active as an undergraduate in PIRG's Clean Water Action Project (Tr. VII, 57). Through PIRG he learned about bureaucracy and the federal government, and developed organizational and group management skills (Tr. VII, 70). He is currently employed at the United States Environmental Protection Agency and believes that his background in environmental work at PIRG helped him choose his career as an environmentalist and helped him get his current job at the E.P.A. (Tr. VII, 70–71).

e. Stuart Brown is a Rutgers graduate who is now the Acting Director of Student Activities at Barnard College (Tr. VIII, 18). While at Rutgers, he worked with PIRG on a non-partisan voter registration drive (Tr. VIII, 20–22). Through his PIRG work he developed organizational and communications skills (Tr. VIII, 23) which help him carry out the requirements of his present employment at Barnard (Tr. VIII, 23–24).

f. Wendy Berthold, currently a senior at Rutgers, has worked as a public relations intern at PIRG (Tr. IX, 5). As part of her work, she supervised the work of other Rutgers students who were serving as interns with PIRG (Tr. IX, 11). She found her PIRG work far more valuable to prepare her for her career than classroom experiences, since at PIRG she was able to do substantial work in public relations—including writing and disseminating actual press releases—under the close supervision of the PIRG staff (Tr. IX, 12). She also values PIRG because as an on-campus group it is highly accessible to the students of Rutgers (*Id.*).

g. John O'Brien, another Rutgers senior, has interned with PIRG to study the cleanliness of the drinking water in New Brunswick, New Jersey (Tr. X, 3–4). He hopes to work as an environmentalist and feels that his PIRG experiences have helped shape his career choice and will ultimately help him get a job in his field (Tr. X, 10–11).

h. Kevin Haverty, currently Director of the Energy Division of the Camden County Department of Public Affairs, is a 1981 Rutgers graduate and a former PIRG intern (Tr. X, 15–16). At PIRG, he researched the feasibility of a state funding program for solar energy for New Jersey citizens of low and middle incomes (Tr. X, 17). As part of his project he did extensive library research and later approached state legislators for support for the proposed funding program (Tr. X, 18–19). He feels that the PIRG staff gave him considerable individual responsibility while guiding him when necessary (Tr. X, 24). He learned about the legislative process through PIRG and decided to pursue a career in public service as a result (Tr. X, 24–25).

37. Those students discussed above who interned with PIRG did so with the approval and supervision of members of the faculty at Rutgers (Tr. VI, 163; Tr. VII, 56–57; Tr. VIII, 59; Tr. IX, 10; Tr. X, 4–5, 22–23). When faculty members authorize PIRG internships they decide what requirements will be imposed and how the student's grade will be computed (Tr. VII, 157–59; Tr. VIII, 36–37).

38. Nine members of the Rutgers faculty, representing a wide variety of academic disciplines, testified for the defendants at trial. No Rutgers faculty members appeared on behalf of the plaintiffs to rebut this testimony. Each of the following faculty members have authorized PIRG internships and granted some kind of academic credit for work performed by their students at PIRG. Five of these professors identified specific features of PIRG that make PIRG internships superior for their students when compared with alternative internships with other organizations.

a. Peter Sandman, Professor of Humanities and Communications at Rutgers, is the curriculum coordinator in journalism and communication at Cook College, one of the constituent campuses of Rutgers (Tr. V, 95–97). Students in his classes intern with on and off-campus organizations, including PIRG, as an activity adjunct to their classroom work (Tr. V, 103–05). He considers internships valuable in general because they provide students with opportunities to work independently; to simulate the "real world" of employment; to integrate their theoretical knowledge with practical experiences; to feel useful; to test the employment marketplace and choose a career; and to help make connections for employment after graduation (Tr. V, 122–25).

Although Dr. Sandman believes that all internships can be beneficial for students, he has found PIRG internships superior to other available internships. This is because PIRG is on-campus and readily available for students; PIRG internships focus on topics like tuition and educational issues that are of direct interest to students; the students who work with PIRG feel that they are working for their own organization, run by and for students, rather than for an "outside" organization, the governance of which is beyond their control; PIRG staff members closely supervise the work of PIRG interns and provide more guidance than supervisors in other organi-

zations; and students at PIRG do significant work and have an opportunity to integrate and develop their skills (Tr. V, 125–31).

b. Marshall Stalley is a former Chairman of the Department of Environmental Resources at Cook College (Tr. V, 141–42) who required his students to work in an internship in conjunction with their classroom work in environmental studies (Tr. V, 149–50). Ten to twenty percent of his students worked with PIRG, generally in PIRG's Clean Water Action Project (Tr. V, 151). He found PIRG's streamwalking project (see Finding No. 33c) particularly educationally valuable, in that students learned about the environment and about the governmental process (Tr. V, 155–56). He believes that PIRG internships are superior to other available internships because PIRG provides "outstanding" supervision of their interns; supervision is provided in a helpful, informal way ("the PIRG staff were kind of informal extensions of the faculty" (Tr. V, 156); PIRG interns feel that they are being active citizens; and students who worked with PIRG were afforded a personal and direct experience with the particular issues on which they worked (Id.).

c. John Van Til is Chairman of the Department of Urban Studies and Community Development at the Camden College of Rutgers (Tr. VII, 3). He regularly invited PIRG staff members to his classes to make presentations to his students about PIRG and its activities (Tr. VII, 8) and has supervised internships by his students with PIRG (Tr. VII, 28–29). He testified that when PIRG supporters lost the most recent referendum at the Camden College of Rutgers, the College lost an important educational resource (Tr. VII, 35). He feels that PIRG provides a "structured educational opportunity" for Rutgers students (Tr. VII, 36) and that PIRG supervisors were committed to an educational mission (Id.). He knew that when his students were placed with PIRG they would receive a "quality educational experience" and questioned whether students could get such an experience from other organizations (Tr. VII, 37).

d. Michael Rockland is Chairman of the American Studies Department at the New Brunswick campus of Rutgers (Tr. VII, 155). He has approved and supervised independent study work for students who intern with PIRG in conjunction with their more traditional classroom work (Tr. VII, 158–65).

e. Michael Delli Carpini is an Assistant Professor of Political Science at Rutgers (Tr. VII, 166) who sponsors and gives academic credit for PIRG interns (Tr. VII, 167–68). He values internships as an opportunity for students to apply their academic experiences to practical situations (Tr. VII, 167). He feels that through PIRG students develop organizational skills, and learn the meaning of citizenship and their responsibilities in the political system (Tr. VII, 173).

f. Thomas Hartmann is a Professor of Journalism and Mass Media at the New Brunswick campus who is a strong advocate of experiential education, i.e., learning through experience (Tr. VIII, 3, 11). He has supervised over a hundred Rutgers students in PIRG internships (Tr. VIII, 11). He feels that PIRG internships are superior to other available internships because of the high level of supervision at PIRG; students at PIRG are part of an organization with available leadership positions and opportunities; and PIRG is a well organized and controlled organization (Tr. VIII, 10–14). To the extent that PIRG takes positions on political issues, Dr. Hartmann views advocacy work on such issues to be in itself educationally valuable because of the opportunities it provides for students to lobby and monitor legislation (Tr. VIII, 16–17).

g. David Rosen was a Professor of Human Ecology at Rutgers for nine years, ending in 1983 (Tr. VIII, 28). He supervised PIRG internships and involved PIRG staff members in the teaching of his classes (Tr. VIII, 29–34). He found PIRG particularly helpful for his students because its staff suggested a range of specific projects for students who knew that they

were interested in a general subject area (Tr. VIII, 41). Dr. Rosen testified that the educational value of PIRG is not diminished by the fact that students working with PIRG sometimes take positions on particular issues, since to advocate a point of view, students must assemble data and focus their arguments in order to prevail (*Id.*).

h. Jay Sigler is a Professor of Political Science and Director of the Graduate Program in Public Policy at the Camden campus of Rutgers (Tr. X, 30) who has supervised students at PIRG as an activity adjunct to their classroom work (Tr. X, 34). He testified that internships are "eye opening" activities (Tr. X, 37) and that PIRG internships are not noticeably different than internships with other organizations (Tr. X, 38). He served in 1980 at PIRG's request as a neutral moderator at a conference about liquified natural gas organized by PIRG with participants representing diverse points of view (Tr. X, 45–47).

i. Michael Lang is Associate Professor of Urban Studies and Director of the Forum for Policy Research and Public Service at Rutgers (Tr. X, 47–49). He has approved and sponsored students' work with PIRG as an activity adjunct to their classroom work (Tr. X, 51). He believes that internships in general are educationally valuable (Tr. X, 52–56). He believes that PIRG internships are superior to other types of available internships because PIRG is a known entity; because unlike other entities PIRG supervisors uniformly do a good job supervising his students; and because the PIRG coordinators were accessible to him and to his students (Tr. X, 56).

39. Some Rutgers faculty and students, including those who enthusiastically embrace PIRG as providing valuable educational opportunities for Rutgers students, acknowledged that PIRG takes positions on issues of social importance and works to advance those positions (Tr. V, 158–59; Tr. VI, 111; Tr. VII, 181–82; Tr. X, 62–63).

As noted above, however, several professors testified that to the extent there exists advocacy in some of PIRG's projects, that fact enhances rather than detracts from the educational opportunities available through PIRG (Tr. VII, 178–80; Tr. VIII, 16–17, 41–42; *see also* Tr. VI, 56 (Dr. Bloustein) and Findings of Fact Nos. 14, 42, 46).

**F. The Opinions of Expert Witnesses About PIRG**

40. Plaintiffs and defendants produced expert witnesses to testify about PIRG at Rutgers and similar PIRGs at universities around the nation. Unlike the students and faculty discussed above, these experts (with the exception of Dr. Bloustein) generally did not have first hand knowledge of PIRG at Rutgers. Their testimony was based in part on their experiences with PIRGs at other universities and in part on a review of documents supplied them by counsel. As discussed below, there existed somewhat conflicting views among these individuals as to the nature of PIRG and PIRG's contribution to the academic community.

41. Plaintiffs produced three experts to testify in support of their position.

a. Herbert London is Dean of the Gallatin Division of New York University and an expert in political science and education (Tr. III, 25–27). He thinks that although internships in general can be educationally valuable (Tr. III, 30, 109–10), PIRG internships lack educational value because students at PIRG are working on projects designed by others toward preordained conclusions (Tr. III, 42–45, 55–56). He feels that PIRG operates as a political action group and has only a negligible educational value (Tr. III, 66–67). He testified that formal education is the crucial function of a university and that student organizations are merely peripheral to a university's educational missions (Tr. III, 111–12, 123).[8]

8. Defendants' experts emphatically rejected Dr. London's view that extracurricular activities are "peripheral" to the educational mission of a university. They testified that Dr. London's view is out of step with the consensus of opinion among university educators (Tr. VI, 37–44, 71–74; Tr. VII, 122–23; *see also supra* footnote 5).

b. Stanley Rothman is a Professor of Government at Smith College and an expert in political science (Tr. IV, 4–5). He believes that PIRG consistently represents and adheres to a liberal ideology and view of American society as covertly oppressive (Tr. IV, 18–19) and that PIRG takes consistent predictable positions on issues about which there exists public controversy (Tr. IV, 38–42). He believes that people join PIRG because they have certain ideological views that are reinforced by membership in PIRG (Tr. IV, 87) and that universities should be places where students are somewhat removed from ideologies and as fair and dispassionate as possible (Tr. IV, 53).

c. Ellis Katz is an Associate Professor of Political Science at Temple University and an expert in political science (Tr. V, 4–5). He testified that PIRG's essential purpose is to pursue change in the political process (Tr. V, 48) and that all of PIRG's activities, including its research and publications, are merely incidental to that purpose (Tr. X, 123–27). He acknowledged on cross-examination that he could not quantify PIRG's political and non-political activities (Tr. V, 48) and that many of PIRG's activities, including its consumer guides, were non-ideological (Tr. V, 53–56).

42. Defendants produced four experts to testify in support of their position.

a. Edward Bloustein, the President of Rutgers, is an expert in college level education and university administration (Tr. VI, 14–16). As noted above, Dr. Bloustein feels that the neutral funding mechanism itself is educational, because it allows students at large to choose democratically the programs they wish to support and forced students to publicly campaign and promote an organization in an effort to gain the support of their peers (Tr. VI, 45; Finding # 11–12).

Dr. Bloustein testified that in PIRG internships students learn through experience, applying the theory of the classroom in practical situations (Tr. VI, 56).

To the extent that PIRG participants take and advocate political positions, he feels they benefit educationally by *learning to advocate* and thoroughly learning their adversaries' positions in order to rebut them (Tr. VI, 57, 62, 65). He drew an analogy to clinical experiences in law schools, as well as in social work and the arts, where students learn through their experiences (Tr. VI, 65–66). He noted that students' individualized PIRG experiences serve as "apprenticeship[s]" for careers and cited examples of Rutgers students who had participated in PIRG who are now professionals in government (Tr. VI, 58).

Finally, Dr. Bloustein noted that PIRG is one of several organizations at Rutgers that engages in advocacy; others include the Rutgers University Legislative Action Committee, a lobbying group funded through the mandatory student fee, and the Eagleton Institute, a Rutgers research center which advocates political positions (Tr. VI, 70–71). He believes that advocacy has an important role to play in the university community, because "[w]hat is essential to freedom of expression and to democracy is to allow the widest possible range of views advocated by those people who believe them" (Tr. VI, 75). He believes that his role as President of Rutgers is to cultivate a "marketplace of ideas" so that the best ideas can prevail (*Id.*).

b. Donald Zander is Associate Vice President for Student Affairs at the University of Minnesota (Tr. VI, 102) and an expert in university administration and education (Tr. VI, 162–70). He is very familiar with Minnesota PIRG ("MPIRG") an organization that was founded in the early 1970s and which is substantially similar to New Jersey PIRG (Exhibit 433; Tr. VI, 179–84). He feels that MPIRG is an "extremely educational" organization, in that it gives students an opportunity to investigate, research, write and advocate their positions before governmental agencies (Tr.

VI, 183, 191–92). He similarly believes that New Jersey PIRG has great educational value and that to the extent PIRG engages in advocacy, the students who participate in those activities have valuable educational experiences (Tr. VI, 190–91).

c. Robert Wood was President of the University of Massachusetts from 1970–1978 (Tr. VII, 82) and is an expert in university administration, education and political science (Tr. VII, 88). In 1972, the University of Massachusetts administration approved a proposal brought to them by students for a PIRG ("MASS-PIRG") at that institution, deciding that a PIRG would provide opportunities for internships; would provide students with an opportunity to work responsibly within the system to further their beliefs; and would provide students with leadership opportunities within their own organization (Tr. VII, 92–93).[9] His experience with MASSPIRG during its first six years at the University of Massachusetts confirmed for him that MASSPIRG significantly enhanced the educational opportunities available for students at that institution (Tr. VII, 105–08). MASSPIRG and New Jersey PIRG are substantially similar organizations (Tr. VII, 111). Dr. Wood believes that substantial educational benefits derive from the presence of PIRG at Rutgers (Tr. VII, 112).

d. Joseph Murphy is the Chancellor of the City University of New York (Tr. X, 83) and an expert in education, university administration and political science (Tr. X, 81). In 1973, while he was President of Queens College, a group of students asked him to support the establishment of a fee to support a New York Public Interest Research Group ("NYPIRG") "to do research on issues of economic, social, political, nature with a view to enhancing their educational horizons" (Tr. X, 86). Their proposal passed with his support (Tr. X, 87–89). He supported NYPIRG because the students wanted to work responsibly for social change; PIRG teaches students to function as citizens; and PIRG allows students to develop practical research and writing skills building on their more traditional academic work (Tr. X, 89–91). He feels that NYPIRG—now funded at seven of the colleges within the City University of New York—substantially contributes to the education of students at that university (Tr. X, 96). NYPIRG and New Jersey PIRG are substantially similar (Tr. X, 96–98). Dr. Murphy feels that the type of work done by PIRG is inherently educational (Tr. X, 97–98).[10]

43. The PIRGs at the institutions represented by defendants' experts, like New Jersey PIRG, are funded by students through fees paid with their registration, with students retaining the option of not supporting PIRG, generally by paying the fee and later getting a refund (Tr. VI, 175–76 (University of Minnesota); Tr. VII, 101–02 (University of Massachusetts); Tr. X, 88 (City University of New York)).

## G. Conclusions

The following Findings are based on the court's overall review of the testimony at trial and the exhibits submitted for its consideration.

> Well, I can't imagine that's an easy think to do. I would say that long after the particular political exercise will have been forgotten, the educational lesson should be retained. Namely, people understand that people who are educated, at least understand that they are not thrown hither and thither in a raging stream but they are in control of their lives and that they have learned to deal with the concepts that describe the conditions of life which they live with. And that's part of what's involved in being educated.
> (Tr. X, 98).

---

**9.** The court notes that the reasons enunciated for the approval of PIRG at the University of Massachusetts are similar to the reasons given by Rutgers in accepting the students' proposal for a PIRG at Rutgers. *See supra* Finding No. 42a; *see also infra* Finding No. 42d (essentially similar reasons given for the approval of a PIRG at Queens College).

**10.** When asked whether he could quantify "educational" and "political" components of New Jersey PIRG, Dr. Murphy responded:

44. The administration at Rutgers has made a carefully reasoned decision that PIRG is a valuable educational adjunct to the more traditional classroom activities at the University. This decision as to the educational value of PIRG was originally made in 1972 and has been formally reaffirmed by the University on at least three occasions, upon review of PIRG's "concept plans." In addition to finding that PIRG itself is educationally valuable, the University found that the neutral funding mechanism itself, with its campaigns and referenda, is inherently educational. The University does not advance its own viewpoints through the neutral funding mechanism, but allows students to choose democratically the organizations they wish to support, while allowing dissenters to obtain refunds of their fees.

45. PIRG staff and students have engaged in a wide variety of public service and educational projects, and have researched, written and published informational guides and pamphlets in many fields of particular concern to students and to the public at large. They have sponsored debates and public fora on matters of public interest. In addition, PIRG, through its board of directors, has taken positions on issues of social importance—such as the development and enforcement of environmental protection laws—and has worked to advance its positions, generally through the dissemination of information and through advocacy in the university community and the general public, and before appropriate governmental bodies. PIRG has thus engaged in projects that can be objectively characterized as both "educational" and "political." Because of the fact that some activities ostensibly political are also inherently educational (*see* Findings Nos. 39 and 42) it is impossible to neatly quantify PIRG's activities into these simplistic categories.

46. To the extent that PIRG engages in advocacy, the experience of being an advocate and working in the political and governmental process is in itself educational. The experience of advocacy teaches students to articulate effectively their positions on issues that concern them, and to become effective participants in the political process. In short, the court finds that the evidence supports defendants' position that students' experiences with PIRG help them learn the value of citizenship in a democracy, and help them develop the tools needed to participate effectively in that democracy.

47. To the extent that PIRG engages in advocacy, PIRG is one of many organizations at Rutgers that takes positions on issues of social importance and works to advance its positions. It is thus one of many voices in the University's marketplace of ideas. Student funding of most of the other "voices" in the university community is mandatory and non-refundable, as part of the general student activities fee.

48. Students at Rutgers are free to support or oppose PIRG and the positions it takes, and are free to oppose PIRG at the periodic referenda held at the constituent campuses of Rutgers. Students who oppose PIRG's views are absolutely free to work together to express their own views. They are also free to invoke Rutgers' neutral, non-ideological special funding policy for the funding of an alternative organization, or to seek funding for their organization through the mandatory student activities fee.

49. PIRG is a student organization. Its Board of Directors, composed entirely of students, select PIRG's activities and the positions PIRG takes on issues of public importance. Although some issues (especially environmental protection) have been of ongoing interest to PIRG, the focus of the organization's energies have varied over the years, as evidenced in part by the diversity of publications produced by PIRG over the years. The implementation of PIRG's activities and policies is largely entrusted to PIRG's professional staff and the student interns and volunteers who work under their direction.

50. The unrebutted testimony of students who have participated in PIRG was that PIRG significantly enhances the edu-

cational opportunities available at Rutgers. It provides leadership positions, opportunities and experiences which allow students to develop organizational, group management and communications skills. Through its wide-ranging internship program, PIRG provides exceptional opportunities for students to learn through actual field experiences, to apply the information they learn in class to practical situations, and to meet and work under the direction of individuals outside the immediate university community, sometimes helping the students choose careers or get jobs in their fields upon graduation.

51. The unrebutted testimony of members of the Rutgers faculty was also that PIRG significantly enhances the educational opportunities available at Rutgers. The professors who testified emphatically endorsed internships as valuable educational adjuncts to classroom experiences. All have given credit for students' work at PIRG and most felt that PIRG internships are superior to other available internships, primarily because of PIRG's excellent supervision of student interns, because PIRG is on-campus and accessible to both faculty and students, and because PIRG is an organization that works on issues of particular interest to students.

52. Eminent university administrators with personal knowledge of PIRGs at other universities have corroborated the defendants' position that PIRG is an educational organization and that the presence of PIRG enhances educational opportunities at Rutgers.

53. To the extent that plaintiffs' experts disagree with defendants' experts about the nature of PIRG and its contribution to the university community, the court finds that there exists on these issues some difference of opinion in the academic community. The unrebutted testimony of Rutgers students and faculty, and the very credible and persuasive testimony of experts from other major academic institutions, support the University's judgment.[11]

54. The court finds that PIRG has a very substantial educational component, and that its presence at Rutgers significantly enhances the educational opportunities available for students at that institution.[12]

11. In the case at bar, the evidence overwhelmingly supported defendants' position that PIRG has substantial educational value. Even if this were a closer case, however, this court would not be free to simply substitute its judgment or the judgments of plaintiffs' experts for the presumptively valid judgment of the Rutgers administration, except under the narrow and inapplicable circumstances enunciated in *Galda, supra,* 686 F.2d at 166. *See Widmar v. Vincent,* 454 U.S. 263, 275–76, 102 S.Ct. 269, 277–78, 70 L.Ed.2d 440 (opinion of the Court), 278–79, 102 S.Ct. 278–79 (Stevens, J., concurring in the judgment) (1981); *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972); *Kania v. Fordham,* 702 F.2d 475, 480 n. 9 (4th Cir.1983) (academic judgments should be made by academicians, not by federal judges).

12. The court notes that on June 1, 1984, three months after the conclusion of the trial in this case, plaintiffs moved pursuant to Federal Rule of Civil Procedure 60(a) to reopen the record to admit certain additional evidence. Plaintiffs contend that they have recently discovered that Rutgers has on at least one occasion sent a delinquency notice to a student who failed to pay the PIRG fee. Plaintiffs seek to admit evidence of this incident and to withdraw from their stipulations that they know of no incident

wherein Rutgers has discouraged students from requesting refunds of the PIRG fee or to punish those students who refuse to pay the fee. *See* Finding No. 18. Defendants vigorously oppose reopening the record of this case at this late date.

The court will deny plaintiffs' motion. First, Rule 60(a) is a rule designed to correct clerical mistakes and other errors, and not to relitigate matters decided at trial. Second, the evidence proffered by the plaintiffs is of dubious relevance, since the delinquency notice in question was simply an administrative "notice of unpaid balance" and did not mention PIRG or the PIRG fee. It therefore does not give rise to the sweeping inferences urged by the plaintiffs that Rutgers specifically attempts to collect unpaid PIRG fees. Third, even if true, evidence that Rutgers once sent a delinquency notice to a student on her tuition bill does not contradict plaintiffs' stipulations that no plaintiff is aware of any incident of Rutgers discouraging students from requesting a refund of their PIRG fee once it is paid, or of Rutgers punishing students for requesting or receiving a refund of their PIRG fee. Plaintiffs' position is therefore without merit.

In any event, the court has concluded that the plaintiffs have not rebutted defendants' presumptively valid judgment that PIRG has sub-

The following Conclusions of Law, insofar as they may also be considered Findings of Fact, are so found to be true in all respects.

## CONCLUSIONS OF LAW

1. Plaintiffs in this action allege that the exaction of the refundable PIRG fee by Rutgers and the payment of that fee to PIRG violates their First Amendment rights. Second Amended Complaint, ¶¶ 32–33.

2. The Rutgers administration has determined that PIRG enhances the educational opportunities available at Rutgers and that PIRG has substantial educational value.

3. "To overcome the presumptive validity of the university's judgment that an organization contributes to the university community, and to make out a prima facie case that exaction of the fee conflicts with the mandates of the First Amendment, persons objecting to the fee must establish that the challenged group functions essentially as a political action group with only an incidental educational component." *Galda v. Bloustein*, 686 F.2d 159, 166 (3rd Cir.1982).

4. Based on the evidence adduced at trial, the court has found that PIRG at Rutgers has a very substantial educational component, and that its presence at Rutgers significantly enhances the educational opportunities available for students at that university.

5. The court therefore finds that the plaintiffs have failed to overcome the presumptive validity of the University's judgment and have thus failed to make out a prima facie case that their constitutional rights have been violated.

6. Judgment of no cause of action will be entered for the defendants and against the plaintiffs.

stantial educational value. This being so, Rutgers could have made the PIRG fee mandatory rather than refundable, and could also legitimately pursue and collect the PIRG fee from

enrolled students who have failed to pay the fee. Thus the result in this case would not be altered in any respect by the evidence plaintiffs seek to admit.