772 F.2d 1060
 54 USLW 2147, 27 Ed. Law Rep. 683
 Joseph P. GALDA, Paul Ewert, Kristina Farrow Cypel, Thomas
H. Odom, Joseph Randall Corman, Lori Keeley, Leslie Beebe,
Leonard Scott Kelter, Edward D. Wickham, and Christopher
Lepre, Individually, and upon behalf of all others similarly
situated, Appellants
v.
RUTGERS, The State University of New Jersey, Dr. Edward J.
Bloustein, Individually, and as President of Rutgers, The
State University of New Jersey, Dr. Norman Reitman,
Individually, and as Chairman of the Board of Governors of
Rutgers, The State University of New Jersey, Donald S.
MacNaughton, David A. Werblin, Katherine Elkus White, Donald
M. Dickerson, Sanford M. Jaffe, Robert Kaplan, Edward
Kramer, Linda Stamato, Robert J. Torricelli, Mary White
Bell, as members of the Board of Governors of Rutgers, The
State University of New Jersey, and Walter K. Gordon,
Individually and as Dean of Rutgers Camden College of Arts
and Sciences, The New Jersey Public Interest Research Group,
Inc., Intervenor.
 No. 84-5498.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 26, 1985.
Decided Aug. 28, 1985.
As Amended Sept. 10 and Oct. 11, 1985.
Rehearing and Rehearing In Bank Denied Oct. 11, 1985.
 
 Joseph W. Marshall, III (argued), Myrna P. Field, Philadelphia, Pa., for appellants; Bradford S. Smith, Cinnaminson, N.J., of counsel.
 Gregory B. Reilly, (argued), Eric Tunis, Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, Roseland, N.J., for appellees.
 John Cary Sims, (argued), David C. Vladeck, Alan B. Morrison, Washington, D.C., for intervenor New Jersey Public Interest Research Group, Inc.
 Before ADAMS, WEIS, and WISDOM,* Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The plaintiff students contend that a mandatory fee imposed on them by a university for the specific purpose of supporting an independent organization whose aims they oppose is an infringement on their First Amendment rights. The district court held that the funding procedure was permissible because the outside organization contributed to the education of its student members. We conclude that because the educational component is only incidental to the organization's ideological objectives, the educational benefits are not adequate to overcome the constitutional objections. Consequently, we will vacate the district court's judgment and direct that collection of the mandatory fee be enjoined.
 
 
 2
 In an earlier appeal in this litigation we reversed a summary judgment in favor of defendants. Galda v. Bloustein, 686 F.2d 159 (3d Cir.1982) (Galda I ). On remand, the district court held a two week bench trial. After filing extensive findings of fact and conclusions of law, the court entered judgment for the defendants. Galda v. Rutgers, 589 F.Supp. 479 (D.N.J.1984).
 
 
 3
 This suit for injunctive relief was brought under 42 U.S.C. Sec. 1983 by current and former students at Rutgers Camden College of Arts and Sciences, a unit of Rutgers, the State University of New Jersey. Plaintiffs asserted that their First Amendment rights were violated by the University's imposition of a mandatory, refundable fee for the specific purpose of supporting the New Jersey Public Interest Research Group (PIRG).
 
 
 4
 The New Jersey PIRG has members at a number of other college campuses in New Jersey. It is an independent, non-profit corporation, controlled by a board of student representatives at the state-wide level. It maintains a paid staff consisting of a director, one part-time and six full-time employees.
 
 
 5
 PIRG is politically nonpartisan, but participates in state legislative matters and actively engages in research, lobbying and advocacy for social change. Its staff and student members have lobbied for a federal student assistance act, the Equal Rights Amendment, a nuclear weapons freeze, and the enactment of the Pine Lands Preservation Act. PIRG also opposed the construction of the Tocks Island Dam on the Delaware River.
 
 
 6
 In addition, members of the organization drafted proposed legislation mandating a study of energy production in New Jersey and testified in opposition to an increase in utility rates before an administrative agency. PIRG members have researched and published documents on a number of other consumer and environmental issues. The organization also provides internships for students who receive academic credit for the work they perform.[1]
 
 
 7
 Because PIRG is an organization independent of the University, it is ineligible to receive money from the general student activities fee. It has, however, qualified for financial support under the Rutgers "neutral funding policy." To do so PIRG was required to submit a "concept plan" to the University outlining the organization's educational value. Following administration approval, the next step was to participate in an election where PIRG was required to obtain the vote of at least 25% plus one of the student body on a particular campus. The neutral funding policy also requires that the votes must represent a majority of the ballots actually cast.
 
 
 8
 PIRG's concept plan has received the University's approval in each of the three-year periods in which it was submitted, and it has been successful in securing the necessary affirmative votes in most of the student referenda.
 
 
 9
 As a result of PIRG's qualification under the Rutgers' funding procedures, each student enrolled at a particular campus must pay a mandatory fee of $3.50 to PIRG. In a twelve year period, the organization received more than $800,000 in this fashion and currently receives over $100,000 per year from the mandatory assessment. A student who does not wish to support PIRG is required to request a refund, which is generally returned several months later.
 
 
 10
 In the first proceeding, without exploring the plaintiffs' contentions, the district court granted summary judgment for defendants, holding that since the fee was refundable, there had been no constitutional infringement. Galda v. Bloustein, 516 F.Supp. 1142 (D.N.J.1981). On appeal from that ruling, we held that the refund provision was not adequate and on that record even a temporary exaction of the PIRG fee from plaintiffs could not be justified. Galda I, 686 F.2d at 169. We remanded because there was a genuine issue of material fact on whether assessment of the fee infringed the plaintiffs' constitutional rights.
 
 
 11
 At trial PIRG's organizational structure was developed in some detail. In essence, the court found that the group's policies were made by the state board of student directors, which also had the authority to hire and discharge the salaried executive director. In addition to an executive director, PIRG hires a paid staff that manages the day-to-day operations of the organization.
 
 
 12
 Plaintiffs produced three expert witnesses who testified that PIRG operates as a political action group and its purpose is to "pursue change in the political process." One expert opined that PIRG "consistently represents and adheres to a liberal ideology and views American society as covertly oppressive." Another of the plaintiffs' experts conceded that he "could not quantify PIRG's political and non-political activities" and that many of its projects were non-ideological.
 
 
 13
 Defendants produced four experts, including the President of Rutgers, who testified to what they believed were the educational benefits to the students participating in PIRG. These included "learning to advocate and thoroughly learning their adversary's position in order to rebut them", forcing students to "publicly campaign and promote an organization", providing an opportunity "to investigate, research, write, and advocate their positions before governmental agencies," providing "students with leadership opportunities," and "teaching students to function as citizens." 589 F.Supp. at 493-94.
 
 
 14
 A number of faculty members as well as current and former students testified about their participation in PIRG activities. The students noted that their experiences included public speaking, learning the use of a law library, and developing interest in a public service, governmental career which some followed after graduation. The faculty members talked favorably about the opportunity for, and close supervision of, internships.
 
 
 15
 One faculty member spoke especially about the "stream walking" phase of the environmental project for clean streams. In this activity, participants walked along water courses in search of illegal polluters who were then reported to the Environmental Protection Agency. The court found this to be a major activity. Faculty members testified that the stream walking program was valuable because of the students' opportunity to learn about the environment and governmental process.
 
 
 16
 The defense witnesses did not dispute that PIRG took positions on political as well as ideological issues and worked actively to advance them. An examination of PIRG's financial documents by a certified public accountant as well as an independent review by the district court established that it was not possible to "numerically quantify 'political' and 'educational' components of PIRG."
 
 
 17
 The district court found that Rutgers "has made a carefully reasoned decision that PIRG is a valuable educational adjunct to the more traditional classroom activities." PIRG had "engaged in projects that can be objectively characterized as both 'educational' and 'political.' Because of the fact that some activities ostensibly political are also inherently educational, it is impossible to neatly quantify PIRG's activities into these simplistic categories." 589 F.Supp. at 495.
 
 
 18
 In passing on the experts' testimony, the court stated that to the extent the parties differ "about the nature of PIRG and its contributions to the university community, the court finds there exists some difference of opinion in the academic community." But, the court concluded, "PIRG has a very substantial educational component, and its presence at Rutgers significantly enhances the educational opportunities available for students at that institution." The court therefore found that "plaintiffs have failed to overcome the presumptive validity of the University's judgment and have thus failed to make out a prima facie case that their constitutional rights have been violated." Accordingly, judgment was entered for defendants.
 
 
 19
 Preliminarily, it is helpful to briefly review the nature of the constitutional right at stake. Plaintiffs assert that they may not be compelled to contribute to an organization which espouses and promotes ideological causes they oppose. The contours of this right are still in the developmental stage. Frequently cited as the seminal case is Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), where the Court recognized an individual's right to refuse on religious grounds to participate in the traditional flag salute. The Court described the right as freedom from "a compulsion of students to declare a belief."
 
 
 20
 The Barnette rationale was extended to the forced payment of "union shop" or "agency shop" fees, portions of which were used for purposes not germane to collective bargaining activities. Those decisions beginning with International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), progressed through Railway Clerks v. Allen, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), to Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).
 
 
 21
 In Abood, the Court found "meritorious" the argument that employees "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representatives." Id. at 234, 97 S.Ct. at 1799. More recently in Ellis v. Brotherhood of Railway, Airline & Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), without discussing the constitutional principle, the Court devoted its attention solely to developing a proper remedy for the violation of the First Amendment right not to support an ideological view the person opposes.
 
 
 22
 In another context, the Court has recognized the right of an individual to reject a state measure that forces him, "as a part of his daily life ... to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." Wooley v. Maynard, 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). See also Zauderer v. Office of Disciplinary Counsel, --- U.S. ----, ----, 105 S.Ct. 2265, 2281, 85 L.Ed.2d 652 (1985).
 
 
 23
 In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court held that contributing to a political message is protected by the First Amendment. See also Federal Election Comm'n. v. National Conservative Political Action Committee, --- U.S. ---- 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Commenting on Buckley, the Court in Abood observed that compelling, as well as prohibiting, "contributions for political purposes works no less an infringement" on constitutional rights. 431 U.S. at 234, 97 S.Ct. at 1799.
 
 
 24
 Significantly, in First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), a First Amendment controversy, the Court drew no subject matter distinction between partisan political topics and those of general public concern.
 
 
 25
 In short, what Abood holds objectionable is the "compulsory subsidization of ideological activity" by those who object to it. 431 U.S. at 237, 97 S.Ct. at 1800. Commentators have debated the basis supporting this right. It may be a broad concept of "individual freedom of mind," Wooley v. Maynard, 430 U.S. at 714, 97 S.Ct. at 1435, or a ban on coerced affirmation of distasteful views, or a right not to be subjected to a limitation on freedom of conscience, or perhaps a right to maintain silence in the face of a governmental pronouncement.[2] We resist the temptation to expound on these absorbing theories because whatever the source or underlying rationale, the Supreme Court's precedents establish to our satisfaction that plaintiffs have presented a valid constitutional interest for consideration.
 
 
 26
 Although the jurisprudential underpinnings for the constitutional right are complex, the issue here is a narrow one and may perhaps best be explained by eliminating what is not at stake. This case does not address the problem presented by a state university's allocation of a mandatory non-refundable student activity fee. We are not concerned here with the question whether an organization with PIRG's philosophic outlook may be funded through the general activities fund as are other campus organizations representing diverse views.
 
 
 27
 In short, we do not enter the controversy on whether a given campus organization may participate in the general activities fee despite the objections of some who are required to contribute to that fund. See, e.g., Kania v. Fordham, 702 F.2d 475 (4th Cir.1983); Maryland Public Interest Research Group v. Elkins, 565 F.2d 864 (4th Cir.1977). See also Note, "Fee Speech": First Amendment Limitations on Student Fee Expenditures, 20 Cal.W.L.Rev. 279 (1984).
 
 
 28
 And, although we are reluctant to belabor the obvious, it apparently must be made absolutely clear that in no way does this case present the issue of whether PIRG or any other organization may be restricted in the expression of its views on campus or elsewhere. Nor does this case in any way question PIRG's right to finance its operations by voluntary contributions from those who agree with its objectives.
 
 
 29
 As Galda I emphasized, there is a distinction between PIRG and student organizations that are funded through the student activity fee. We noted that the student activity fee is used to subsidize a variety of student groups, and therefore that assessment can be "perceived broadly as providing a 'forum' for a diverse range of opinion." In contrast, "PIRG does not provide a forum for the expression of differing views" but is a "group." Id. at 166. Moreover, the PIRG fee is segregated from other charges listed on the students' bills and supports only that "group."
 
 
 30
 The question here is limited to whether a state university may compel students to pay a specified sum, albeit refundable, to an independent outside organization that espouses and actively promotes a political and ideological philosophy which they oppose and do not wish to support.
 
 
 31
 In Galda I, we noted that "considerable deference" should be accorded the university's judgment that the organization was "an appropriate participant in the total university forum." In order to "overcome the presumptive validity of the university's judgment and to make out a prima facie case that exaction of the fee conflicts with the mandate of First Amendment," plaintiffs must establish that PIRG "functions essentially as a political action group with only an incidental educational component." Id. at 166. In addition, we stated that the university is free to "counter the plaintiff's showing or to otherwise demonstrate a compelling state interest by establishing the importance of the challenged group's contribution to the university forum." Id. at 166-167.
 
 
 32
 In speaking of a prima facie case, Galda I referred to the "exaction of the fee", referring to the mandatory assessment of the payment to PIRG. The elements of compulsion and payment to an outside organization with which the plaintiffs disagree are the significant factors that trigger the inquiry in this case.[3] Whether the compulsion occurred through unilateral decision of university officials or only after the vote of a majority of the students does not diminish the infringement on the plaintiffs' right to withhold their support to an organization whose aims they find repugnant.
 
 
 33
 At trial plaintiffs presented evidence that PIRG, in at least some, if not a majority, of its activities is an entity devoted to political and ideological objectives. Defendants did not dispute that fact, but instead focused on the educational benefits associated with participation in the PIRG program. As noted earlier, these include observing governmental agencies in action, public speaking, research, leadership development, and other factors which may ordinarily be obtained from the "hands-on" training common to any large organization and particularly one that has some contacts with government.
 
 
 34
 The educational advantages described in the testimony do not differ from those that might be obtained by working with, or for, an independent organization such as the Republican or Democratic Party, or a clearly religious group which has undertaken an active and vigorous proselytizing program. As we have said, "it could not be seriously contended that student fees could be funnelled to such a group." 686 F.2d at 166. Yet, the educational component that the University presents here as justification would be precisely the same were the recipient group one that clearly could not receive affirmative state support.
 
 
 35
 PIRG's efforts are primarily devoted to changing conditions outside the University. For example, its interest in environmental and energy concerns focuses on state-wide or national issues. Similar in scope is its commitment to enactment of an equal rights amendment, reform of tenants rights, and a nuclear weapons freeze. While such matters may affect the general public, those causes are not particularly germane to students of the University qua students.
 
 
 36
 Although such issues as educational loans and consumer protection reports on businesses near campus may come closer to direct student interests, they do not minimize the group's activities of a broader scope. In this respect, PIRG's programs and purposes are quite unlike a service organization, such as a bar association, which in the course of promoting the specialized interests of the group may at times take positions opposed by various members. See Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961).
 
 
 37
 Although the training PIRG members may receive is considerable, there can be no doubt that it is secondary to PIRG's stated objectives of a frankly ideological bent. To that extent the educational benefits are only "incidental"--arising from or accompanying the principal objectives--and subordinate to the group's function of promoting its political and ideological aims.
 
 
 38
 It is not quantity that determines whether the benefit is incidental in circumstances such as these. That assessment is made by examining the nature of the group and its primary function. Galda I made that point in noting that in the procedural posture of the case, the court had to assume "at least one of PIRG's functions is purely political, and non-educational in nature." 686 F.2d at 164-65. The district court in reciting PIRG's history stated, "Under the students' proposal, PIRG was to be a non-partisan, non-profit corporation which would research and lobby for social change." 589 F.Supp. at 483. Those functions have continued to be PIRG's raison d'etre as a review of its programs and activities confirms.
 
 
 39
 The experience gained from lobbying activities as well as advocacy, leadership, public speaking, and research might just as readily be obtained by membership in the University sponsored Legislative Action Committee, by participation in internships in various governmental agencies also available to Rutgers students, and through the work of other campus organizations.
 
 
 40
 Moreover, it must be recognized that because the plaintiffs are opposed to PIRG's ideological aims, the educational benefits flowing from PIRG's activities will not be available to them. Their beliefs exclude them from access to the programs that offer the educational opportunities. Despite that bar to participation, plaintiffs must nevertheless pay to support the organization.[4]
 
 
 41
 We conclude that defendants did not overcome the caution we raised in our first opinion--the educational component cannot obscure the underlying substance of the plaintiffs' complaint that they were compelled to finance a political entity whose function is to attain certain fixed ideological objectives. 686 F.2d at 166.
 
 
 42
 Moreover, the evidence revealed that it is impossible to isolate the "educational component" from the ideological pursuits for purposes of apportioning the expenses attributable to each. It is difficult to believe that it could be otherwise since the educational benefits are intertwined and integrated with the political and ideological objectives. It is no simple task, and probably an impracticable one, to formulate principles that could be used to separate the educational component of lobbying, campaigning, or researching a paper that urges passage of certain legislation from the organization's ideological goal which is directly advanced by those activities.
 
 
 43
 The courts have observed that it is not always easy to prorate the expenses properly incurred by a union as collective bargaining representative with those involving political action. See Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). It is however even more complex in the case of PIRG because the educational gains are obtained only in direct pursuit of the ideological objectives.
 
 
 44
 In Galda I, we left open the possibility that the University might demonstrate a compelling state interest by establishing the importance of PIRG's "contribution to the university forum." Because he believed that plaintiffs had failed to present a prima facie case, the district judge did not reach this question. The defendants did, however, have the opportunity to produce evidence on this point and rather than remand again for a determination of what is primarily a legal question, we address the matter here.
 
 
 45
 The University shoulders a heavy burden to justify its determination to levy the assessment. A state may not choose means that unnecessarily restrict constitutionally protected liberty, if there is open a less drastic way of satisfying its legitimate interest. Nor may the state choose a legislative scheme that broadly stifles the exercise of fundamental liberties. Elrod v. Burns, 427 U.S. 347, 363, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); Buckley v. Valeo, 424 U.S. at 25, 96 S.Ct. at 637.
 
 
 46
 The compelling state interest in eliminating "free riders" in the interest of preserving labor peace in the union dues context, see Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), does not exist in the circumstances here. The University has presented no evidence, nor do we believe it could, that the educational experience which it cites as justification could not be gained by other means which do not trench on the plaintiffs' constitutional rights. We recognize that a union's concerns and those of a university differ, particularly in light of the latter's traditional interest in presenting and discussing differing philosophies and theories on a wide range of topics. The relevance of Abood, however, is not lost because of those distinctions.
 
 
 47
 As we cautioned earlier, we do not here decide the constitutionality of a university's allocation of a compulsory activity fee. But a comparison of that procedure with the "content neutral" funding scheme for entities outside the university as used at Rutgers is helpful in demonstrating the objectionable features of the mandated fee challenged here.
 
 
 48
 One of the arguments used to justify allocation of activities fees to speakers or campus organizations that present controversial views is the educational necessity of exposing the university community to a diversity of responsible opinion. In fulfilling its role, it is expected that a university will strive for balance and afford adequate opportunity for offering opposing viewpoints.
 
 
 49
 There is room for argument that a university's role of presenting a variety of ideas is a sufficiently compelling reason for some infringement of First Amendment rights just as is the need for labor peace in the union dues cases. That contention loses its force, however, when an outside organization independent of a university and dedicated to advancing one position, is entitled to compelled contributions from those who are opposed. In that situation a university's ability to insure a balance in access is infringed, if not prevented, in some circumstances and the quid pro quo for a payment to a forum disappears.
 
 
 50
 Generally, when an activity fund comes into existence, all student groups on campus are free to compete for a fair share. That is not the situation here where the mandated contribution is earmarked for only one organization, an organization which has no obligation to use any part of the fund for the benefit of a group which pursues a different philosophy.
 
 
 51
 The University appears to argue that the neutral funding policy supplies the requisite opportunity for equal access, but it is no answer to say that opponents may utilize the "neutral funding" policy to support a vehicle of their own. For example, the opponents may be small in number, as is apparently true here, and unable to attract the necessary student support. No extended discussion is required to explain the basic concept that the First Amendment protects the views of a minority as well as those of the majority.
 
 
 52
 Moreover, even if the opponents succeed in achieving mandatory contributions for their own organization, they are not relieved from the obligation to pay a fee to a group with which they disagree. For example, if the university compelled a student to make separate contributions to both the Democratic and Republican National Committees, the evil is not undone; it is compounded. Adherents to each party would be forced to pay a fee to the other political group, a clearly unconstitutional exaction.
 
 
 53
 The objection to funding an outside entity through the "neutral funding" procedure is that the result achieved is not neutral and does not achieve equal access. The process offers an opportunity for a majoritarian group to compel support from minorities in circumstances where no compelling state interest justifies the limitation on First Amendment rights.
 
 
 54
 The situation is quite different than that which would be presented if the outside organization, for example, were a well equipped museum or symphony society where the university had no comparable facilities to enhance its teaching capacity. Nothing in the record here demonstrates that in its ordinary operations the University is unable to offer students the opportunity to learn about environmental or consumer concerns or similar matters advocated by PIRG.
 
 
 55
 The University has thus failed to show any compelling state interest that would justify overriding the plaintiffs' First Amendment rights.
 
 
 56
 It follows, therefore, that the district court erred in concluding that plaintiffs had failed to make out a prima facie case. They presented credible evidence that PIRG was an outside independent, ideologically-oriented organization whose activities they opposed but were nevertheless compelled to support directly through a mandatory fee. Those facts were not disputed, and by presenting that evidence plaintiffs established a prima facie case.
 
 
 57
 The University relied on the deference to be given its judgment as to PIRG's educational value. But as has been discussed, that judgment was not supported by evidence of an educational component other than that incidental to, and inherent in, the ideological activities. Moreover, the district court did not make any findings to demonstrate a compelling state interest that would justify utilization of PIRG as a vehicle for the incidental educational benefits in preference to a campus, or another outside organization, which did not require the compelled support of plaintiffs.
 
 
 58
 Defendants did not produce any evidence that would allow an advance proration of the mandatory fee, see Robinson v. New Jersey, 741 F.2d 598 (3d Cir.1984), and we have previously found the rebate procedures unsatisfactory. Hence, the exaction of a compulsory fee payable to PIRG cannot continue. We, of course, make no judgment as to a voluntary contribution program.[5]
 
 
 59
 Accordingly, the judgment of the district court will be vacated and the case will be remanded to the district court for the entry of an order enjoining the assessment of the mandatory fee payable to PIRG.
 
 
 60
 ADAMS, Circuit Judge, dissenting.
 
 I.
 
 61
 I agree with the majority that PIRG's objectives are in some sense political; I also share the majority's implicit doubts about the wisdom of the Rutgers funding policy that is under review here. Nonetheless, I am impelled to dissent, for in my view, the First Amendment does not permit the courts to translate a determination that speech is political or that a university's decision is unwise into a conclusion that an outlet for campus speech is unconstitutional and must be foreclosed. When a disagreement with the politics of a group or the wisdom of a policy is transformed into intrusive judicial review of core university decisions, I believe we take an improvident step. Indeed, as I read the applicable Supreme Court cases and this Court's decision in Galda v. Bloustein, 686 F.2d 159 (3d Cir.1982) (Galda I ), the First Amendment not only fails to support such an approach, it may very well preclude it.
 
 
 62
 The crux of my disagreement with the majority concerns the proper interpretation and application of the prima facie threshold this Court articulated in Galda I :
 
 
 63
 To overcome the presumptive validity of the university's judgment that an organization contributes to the university community, and to make out a prima facie case that exaction of the fee conflicts with the mandates of the First Amendment, persons objecting to the fee must establish that the challenged group functions essentially as a political action group with only an incidental educational component.
 
 
 64
 686 F.2d at 166 (emphasis supplied). The majority reads the standard established in Galda I to require courts to weigh a group's political objectives against its educational benefits to determine which are "primarily" its goals. See Majority at 1065. This interpretation allows the majority to concede that PIRG provides students with "considerable" training, and yet to conclude that such educational benefits are only "incidental" to its main objectives.[1] Id. Under the majority's reading, if the group's principal objectives are political, the extent of its educational benefits is necessarily incidental or secondary. Id. In my view, this analysis misconstrues the Galda I standard, and improperly extends the compelled association doctrine to a university setting without adequately considering the university's central role of providing an education through the exchange of diverse viewpoints. Because the majority's result conflicts with several lines of First Amendment precedent, I respectfully dissent.
 
 II.
 
 65
 Resolution of the issues raised in this appeal requires careful attention to the particular features of the challenged funding mechanism. See, e.g., Ellis v. Brotherhood of Railway, Airline, & Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The majority acknowledges that the $3.50 fee is fully refundable, but then repeatedly characterizes the refundable fee, incorrectly I believe, as a "mandatory assessment" or "compelled contribution." See Majority at 1065, 1066, 1067, 1067-1068. This case necessarily implicates competing First Amendment interests of the university itself, as well as of those students who participate in PIRG, those students who merely desire exposure to its viewpoints, and those students--plaintiffs here--who oppose its views altogether. Where so many competing interests are involved, it is crucial to consider the extent of infringement of plaintiffs' rights. See Kania v. Fordham, 702 F.2d 475, 476 n. 3 (4th Cir.1983) (noting in a similar case challenging mandatory funding of a "liberal" school newspaper that amount of fee compelled is $4.60 a year, and that extent of abridgement must be considered in striking the balance between educational goals of the university and the speech and association rights of its students); Gaebler, First Amendment Protection Against Government Compelled Expression and Association, 23 B.C.L.Rev. 995, 1014-17 (1982) (arguing that Supreme Court's decisions in compelled association cases can be reconciled only by considering the extent of the infringement on individual's right not to associate). Plaintiffs' complaint concerns a temporary, fully refundable, payment of $3.50 a year. As this Court has pointed out, "a temporary deprivation of funds does not have the same impact on constitutionally protected speech that the denial of a forum or the forcible contribution to a political cause against one's will would have." Robinson v. State of New Jersey, 741 F.2d 598, 611 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985).[2]
 
 
 66
 Imposition of a wholly refundable fee to support one voice in a university forum is a far cry from the sorts of compulsion heretofore considered unconstitutional under the compelled association doctrine. In Barnette, the foundation of this doctrine, students were literally compelled to stand up and recite in public a pledge that they did not believe. In Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), individuals were compelled to display in public a motto that offended their religious tenets. And in Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), union members were forced to provide financial support to an organization whose sole purpose was to serve as their exclusive mouthpiece, but which promulgated views that some members opposed.
 
 
 67
 Rutgers forces no student to participate in or pledge allegiance to PIRG. Moreover, PIRG is in no way the sole mouthpiece of Rutgers students, and does not purport to speak for the student body on any matter. Rather, it participates as one voice among many student groups, all of which receive some level of funding from student fees, and all of which contribute distinct viewpoints to the university forum. PIRG and the school newspaper do receive more funds than other student groups, but only because they have satisfied certain objective requirements open to all regarding educational benefits and widespread student support. The PIRG fee is, moreover, fully refunded within the school year when a student checks off a card included with the term bill.
 
 
 68
 Thus, we must keep in mind the relatively minimal degree of infringement on plaintiffs' First Amendment rights. Because Galda I was decided at the summary judgment stage, we had to assume that PIRG had only an incidental educational value and was not otherwise justified. We held in those circumstances that the refund mechanism would not be sufficient to cure the constitutional defect. The majority appears to consider the refund issue decided for all situations. See Majority at 1066. The Robinson and Ellis decisions, however, demonstrate that whether and how the fee is refundable are critical considerations in weighing competing interests and balancing relative infringement of rights.
 
 
 69
 The fact that the PIRG fee is fully refundable serves two purposes. First, it allows objectors to register their position immediately, so there is less danger that their views will be confused with those of PIRG. Second, it gives objectors their money back, so that they are not in fact compelled to support the group. If the funding mechanism were shown to be merely a ruse for advancing certain ideological views, this Court has held that the refund would not be sufficient. Galda I, 686 F.2d at 169. If plaintiffs had demonstrated that the added institutional support provided by the separate funding mechanism was motivated by educators' ideology rather than by their desire to assure the vitality of an organization engaging widespread student interest, I would not dissent, regardless of the refund. Where no such showing has even been suggested, however, and where PIRG in fact has been found by extensive testimony to have "a substantial educational component," the effect of the refund mechanism is relevant in determining the extent of the First Amendment infringement relative to competing interests of other students and the university. As will be demonstrated, the competing interests involved here are considerable. In view of those interests, I conclude that a fully refundable fee of only $3.50 per year does not impermissibly violate the First Amendment rights of objectors.
 
 III.
 A.
 
 70
 Four distinct lines of First Amendment doctrine converge in this case to suggest that the majority's interpretation of Galda I is incorrect. The first, perhaps best characterized as prudential, concerns the limited role of federal courts in overseeing a university's educational policy. The majority's rationale subjects state university academicians to intrusive judicial oversight in educational matters, contrary to Supreme Court admonitions about the necessity for deference in this area. See Widmar v. Vincent, 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981); id. at 279 n. 2, 102 S.Ct. at 279 n. 2 (Stevens, J., concurring); Healy v. James, 408 U.S. 169, 180-81, 92 S.Ct. 2338, 2345-46, 33 L.Ed.2d 266 (1972); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).[3] This call for deference is not intended to denigrate students' First Amendment rights; rather, it recognizes that federal court review of university decisions carries serious implications for academic freedom. Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957).
 
 
 71
 Under the majority's reading, the only limitation on judicial intrusion is a judge's view of what constitutes a "political" objective.[4] The majority states that where a judge finds that a group assisted by the university through student fees is "primarily political" in nature, the First Amendment mandates that the group be denied such assistance. While it attempts to limit its holding to the facts of this case, no principled basis is advanced to distinguish the program in question here from the mandatory general activities fee that supports such student groups at Rutgers as the ACLU and the NAACP, or indeed, from similar mandatory activity fee programs in state universities across the country. The majority's rationale suggests, for example, that if a law journal at a state university can be said to have political objectives--insofar as, like PIRG, it might take a particular ideological stance, and seek to influence legislation on issues of public controversy beyond the campus environs--its funding from student tuition or fees must be cut off.[5]
 
 
 72
 The mere possibility of such judicial oversight of educational decisions effectively invites abusive litigation by any student who objects to the political position of a funded student group. Whether or not such suits ultimately succeed, their institution, and even the likelihood of their institution, would seriously restrict the First Amendment freedom of state universities to provide a wide-open marketplace of ideas, and of student groups to speak out on matters of public importance.
 
 B.
 
 73
 A further indication that the majority's reading of Galda I has missed the mark is its result: the Court orders a state university to exclude from a refundable arrangement a group that repeatedly has met all objective requirements of an equal access forum, and that concededly provides substantial educational benefits to the students, simply because the content or objectives of the group's speech are too "political." This comes close to requiring a state university to do precisely what the Supreme Court declared unconstitutional in Consolidated Edison v. Public Service Commission, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). There, the Supreme Court held that a state body may not prohibit a utility from using bill inserts to discuss "political matters." 447 U.S. at 532, 100 S.Ct. at 2330. Here, the majority holds that a state body must exercise content control in a manner that will inhibit speech that is primarily political, or politically motivated.[6]
 
 
 74
 As the Court stated in Consolidated Edison, the prohibition or inhibition of speech concerning issues of public controversy "strikes at the heart of the freedom to speak." 447 U.S. at 535, 100 S.Ct. at 2332; see also Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966) ("there is practically universal agreement that a major purpose of the [First] Amendment was to protect the free discussion of governmental affairs").
 
 C.
 
 75
 Perhaps more fundamentally, the majority's reading is inconsistent with the two central doctrines that guided the Court in Galda I: (1) the analysis applied to claims of compelled association in Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); and (2) the public forum doctrine as applied in Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and related cases.
 
 
 76
 In Abood, the Supreme Court held that the imposition of compulsory union dues violated objectors' First Amendment rights not to associate when such dues were used for political purposes unrelated to bargaining. Abood does not stand for the proposition that no political speech may be funded by mandatory union dues. Only political speech substantially unrelated to the union's central purpose--collective bargaining--may not be so funded. The Galda I test substitutes the university for the union, by barring mandatory funding of political speech substantially unrelated to the university's central purpose--providing an education.[7]
 
 
 77
 Abood and its progeny are best understood as establishing a two-step inquiry where claims of compelled speech are raised in a context of institutional fees. The first determination, whether the speech is political, reveals the extent of the infringement caused by compelled support. See Ellis v. Brotherhood of Railway, Airline, & Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984) (compulsory contributions to union's social activities do not implicate any greater infringement on First Amendment rights than the permissible contributions already required for collective bargaining). Once an infringement is identified, the second and more crucial question is whether the compulsion is nevertheless justified because the speech is germane to the institution's purpose.
 
 
 78
 The two-step analysis required by Abood and Ellis is confirmed by this Court's recent application of Abood in Robinson v. State of New Jersey, 741 F.2d 598. In Robinson, we upheld the constitutionality of compelled support for lobbying on behalf of public employees' contracts, on the ground that activity relevant to collective bargaining may be funded even if it is also political. 741 F.2d at 609. The Galda I standard is drawn from Abood, and incorporates Abood's two-part inquiry. Galda I directs the district court to ask (1) whether the group funded is primarily a political action group; and (2) if the group is political, whether its speech is nonetheless germane to the university's purpose in providing an education through exposure to a marketplace of ideas--i.e., whether the group has more than "an incidental educational component." 686 F.2d at 166. The majority sidesteps the second part of the Galda I prima facie inquiry by finding that the group's "political" objectives effectively negate its educational component. It holds that where a group's objectives are primarily political, the extent of the group's educational benefits to the university community is immaterial. This application treats a two-step test as a call to subjective balancing.
 
 
 79
 Although some of its activities are political, the district court found that PIRG does in fact play a significant educational role in the university forum, and has a "very substantial educational component." 589 F.Supp. at 496. In minimizing PIRG's educational benefits, the majority determines sub rosa that this finding is clearly erroneous. The district court's finding, however, is comprehensively supported by the record, which includes the following facts:
 
 
 80
 1. PIRG's objectives, as stated in its Articles of Incorporation, are two-fold:
 
 
 81
 a. to engage in non-partisan analysis, study and research of such issues as urban revitalization, consumer protection, resource planning, urban and rural occupational safety and labor conditions, protection of natural areas and environmental quality, racial and sexual discrimination, landlord-tenant relations, delivery of health care and similar matters of urgent or long-range concern to the general welfare of the people of the State of New Jersey.
 
 
 82
 b. to make available to the public at all times a full and fair exposition of the pertinent facts and results of such non-partisan analysis, study and research so that citizens may form independent conclusions beneficial to the community.
 
 
 83
 Galda v. Rutgers, 589 F.Supp. at 487.
 
 
 84
 2. PIRG's activities, in addition to the lobbying highlighted by the majority, include: sponsorship of debates, lectures, and public fora within the university on issues of public policy; publication and distribution on campus of informational pamphlets and consumer guides on various topics, including solar energy, student financial aid, and the transportation system at a Rutgers campus; non-published research papers on similar subjects; staffing a consumer hotline; and conducting a "streamwalking" program to identify sources of illegal water pollution. Id. at 487-88.
 
 
 85
 3. PIRG is governed entirely by students elected by their peers at both the local and state levels. It is "independent" from Rutgers only insofar as its governing board includes students drawn in addition from several other universities in the state. Its work is conducted by student volunteers, student interns who receive academic credit, and several staff employees. PIRG's educational benefits were testified to by eight past and present students who had participated in PIRG, id. at 489-90; nine faculty members who had supervised student internships with PIRG, id. at 490-92; and four experts, including two university presidents, a vice-president, and a chancellor, id. at 493-94.
 
 
 86
 4. Plaintiffs called no Rutgers students or faculty to rebut the testimony from students and faculty presented by defendants. The sum total of plaintiffs' testimony consisted of three outside experts. Of the three, one testified that extracurricular student activities were "merely peripheral to a university's educational mission," and another stated that "universities should be places where students are somewhat removed from ideologies and as fair and dispassionate as possible." Id. at 492-93.
 
 
 87
 Given these comprehensive, painstaking findings by an able district judge, I do not believe we can say that the district court erred in concluding that the plaintiffs failed to make out a prima facie case, because PIRG has more than an incidental educational component.
 
 D.
 
 88
 My most critical concern regarding the majority's First Amendment analysis is its narrow focus. This focus may be attributable to the posture of this case, which was initiated by a handful of students objecting to the funding of a particular group. The Galda I prima facie threshold concentrates in the first instance on these objections, but the majority's interpretation renders that focus exclusive. The majority approach implies that the only First Amendment interest at stake is that of objecting students not to have $3.50 temporarily exacted from them. The Court in Galda I, however, recognized that there were other interests at stake, and insisted that the inquiry also consider the role of the particular group in the "total university forum." 686 F.2d at 166-67.
 
 
 89
 A broader perspective demonstrates that we are not dealing with a single speaker, but with one of many speakers in an equal access university forum that also supports a variety of student groups. In addition, we must consider not only the rights of the objecting students, but also the right to associate effectively of the large number of students who voted for, participate in, and want to support PIRG, as well as the right of the student body as a whole to receive information through the exchange of ideas that inheres in the very nature of a university education. Finally, the majority may be overlooking the delicate First Amendment role of a state university in operating an equal access educational forum.
 
 
 90
 While these additional considerations may appear to complicate the task, they point to a well-established doctrinal approach developed precisely for situations in which all of these competing interests are inevitably intertwined--the public forum doctrine. That doctrine holds that where the state opens a forum to expression, it must operate the forum on a content-neutral basis. See generally Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440.[8]
 
 
 91
 Developed to protect groups excluded from a state forum on the basis of the content of their speech, the public forum doctrine also answers many of the concerns raised by the objecting students here. Whenever a government body supports speech, it might be charged that those who contribute to that body, either through taxes, tuition, or fees, are compelled to support a particular point of view. At the same time, government institutions control many effective fora for speech, so if objectors' complaints were everywhere converted by the First Amendment into bars to speakers' access and support, the marketplace of ideas would be restricted. Therefore, the First Amendment requires the government to administer a public forum on a content-neutral, equal access basis (with the exception that a forum may be reserved for its intended purpose).[9] If this rule is followed, the objectors' compelled support is not tied to any particular viewpoint, but to the forum as a whole. As long as the contribution is to a public forum, rather than to an ideological group, the First Amendment is not impermissibly infringed. See Veed v. Schwartzkopf, 353 F.Supp. 149, 152 (D.Neb.) (applying public forum analysis to claims of infringement on right not to associate), aff'd mem., 478 F.2d 1407 (8th Cir.1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 878, 38 L.Ed.2d 760 (1974); Lace v. University of Vt., 131 Vt. 170, 303 A.2d 475, 479 (1973) (same); Cantor, Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association, 36 Rutgers L.Rev. 3 (1983) (arguing that critical constitutional interest in compelled association or speech cases is government establishment of particular points of view).
 
 
 92
 The public forum doctrine accommodates the various First Amendment interests implicated in the educational context: it permits a university to facilitate an exchange of diverse viewpoints; it provides students the opportunity to receive the educational benefits of such an exchange; it allows those students who want to associate the right to do so effectively; and it ensures that students who do not want to associate with a particular point of view are not forced to support a particular group, but rather an entire forum.
 
 
 93
 The doctrine has been applied in the educational context. "The campus of a public university, at least for students, possesses many of the characteristics of a public forum." Widmar v. Vincent, 454 U.S. at 267, 102 S.Ct. at 273 n. 35 (cited in Galda I, 686 F.2d at 166); cf. Healy v. James, 408 U.S. at 180, 92 S.Ct. at 2345 ("The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.' ") In Widmar, the Court utilized a public forum analysis in considering whether a religious group could be allowed to use state university facilities. The Court noted that the university had created an open forum for student groups, and that having done so, it could exclude a group from the forum on the basis of the religious content of the group's intended speech only if it showed that "its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." 454 U.S. at 270, 102 S.Ct. at 274. Where the university merely allowed religious groups equal access with other groups, it did not infringe the Establishment Clause, and the university's exclusion of religious groups could not be justified. See also Bender v. Williamsport Area School District, 741 F.2d 538 (3d Cir.1984) (applying public forum analysis for public high school); cf. International Society for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Authority, 691 F.2d 155, 160 (3d Cir.1982) (dicta stating that public high school constitutes a limited public forum).
 
 
 94
 In this case, as in Widmar, the university has created an open forum.[10] Any group that meets certain criteria regarding educational value and student support is granted access through the neutral funding mechanism. Student groups receiving less wide-ranging support are also granted access, through the mandatory fees program. There is no evidence in the record, nor any allegation in the complaint, that either the neutral funding mechanism through which PIRG is supported, or the university forum as a whole, is operated on other than legitimate educational equal access grounds.[11] The issue here is whether a political group may be allowed access to that forum without violating competing rights of objectors. The competing interest in Widmar, it was argued, was the protection of members of the university community against the establishment of religion; the competing interest in Galda is the objectors' right not to have $3.50 temporarily taken from them in violation of their right not to associate with groups with which they disagree. In Widmar, the Establishment Clause was not deemed to have been infringed in that particular setting because where the university had created an open forum that accommodated religious groups, the "open forum ... does not confer any imprimatur of State approval on religious sects or practices" granted access to the forum. 454 U.S. at 274, 102 S.Ct. at 276; see also Bender, 741 F.2d at 561 (Adams, J., dissenting) (advocating same result in secondary school). Similarly, here, the Rutgers open forum does not confer any imprimatur of approval (by the university or by the students paying fees to the university) upon the ideologies of groups granted access to the forum. PIRG's participation in the forum indicates only that, like the school newspaper, it met the educational and objective criteria set forth by the university.[12]
 
 
 95
 The public forum analysis in Widmar and Bender insists that courts not allow (and, logically, not require) content-based exclusions from an otherwise equal access educational forum unless there is a compelling state interest. The question that must inform the entire analysis, therefore, is whether a student's right not to have $3.50 temporarily exacted from him for a forum that supports a group with which he disagrees is a sufficiently compelling state interest to justify an exclusion based on the political content of the group's intended speech.
 
 
 96
 This is not to suggest that in all instances the operation of a bona fide equal access forum should suffice to defeat objectors' complaints of compelled association, but only that in many situations such a forum best balances the interests of objectors against the interests of speakers and listeners in a robust exchange of ideas. It does so, moreover, without requiring the inhibition of speech. The majority's result, on the other hand, would effectively inhibit political speech under the rubric of the First Amendment. Although we must be careful not to minimize the complaints of objectors, at the same time we must not exaggerate those complaints to the detriment of equally important competing First Amendment rights. As is so often the case in the First Amendment field, we are confronted with competing interests, not absolute rights. I would hold that where a state university establishes an educational equal access forum funded by student fees, it does not impermissibly violate objecting students' First Amendment rights by directing their fees to particular groups, so long as it grants access to the funding mechanism on educational and equal access grounds.
 
 IV.
 
 97
 The First Amendment clearly does not prohibit nonpartisan[13] political speech or association in state universities; indeed, the spirit of the First Amendment suggests that courts should do everything within reason to protect political speech in the educational setting. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266; Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. Outlets for effective speech or association on campus cost money, some of which may and often does come from students' tuitions or fees.[14] Often a conflict between speakers and objectors will arise. Unless a veto is to be granted to all objectors to "political" speech, we must consider the competing interests, and seek an appropriate balance. In many cases, the public forum approach strikes such a balance. Here, the availability of a refund further protects the rights of objectors. Only in rare cases should the balance be struck by excluding political speech.
 
 
 98
 When the federal courts undertake judicial review of educational decisions of state university officials, it is critical that the boundaries of that review be carefully delineated. When the only limit on such review is a judge's definition of "political," we may have overstepped our bounds. And when the result of such review is the inhibition of speech on the basis of its political content or motives, the First Amendment has not been served. Accordingly, I dissent.
 
 
 
 *
 The Honorable John Minor Wisdom, Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 PIRG's concerns include environmental preservation efforts, consumer protection, womens rights, tenants rights, tuition policies, and energy conservation. Assisted by several Rutgers law students, PIRG's staff attorney has at various times represented it in litigation connected with these programs
 
 
 [2]
 See, e.g., Gaebler, First Amendment Protection Against Government Compelled Expression and Association, 23 B.C.L.Rev. 995 (1982); Cantor, Forced Payments to Service Institutions and Constitutional Interests In Ideological Non-Association, 36 Rutgers L.Rev. 1 (1983)
 
 
 [3]
 These factors distinguish the situation where the challenged group is part of the university community and is funded through the student activity fee
 
 
 [4]
 Moreover, because they disagree with PIRG's policies, plaintiffs would not likely become members and hence would have no voice in the selection of leaders for the group. Again, that does not relieve them from the compulsory assessment
 
 
 [5]
 At trial, the voluntary funding procedures used by PIRG at the University of Minnesota and the University of Massachusetts were described in some detail. We do not express any views on those procedures, but they do differ from Rutgers' because they allow students to decide in advance if they wish to support PIRG
 
 
 [1]
 The district court's final factual finding was as follows: "The court finds that PIRG has a very substantial educational component, and that its presence at Rutgers significantly enhances the educational opportunities available for students at that institution." Galda v. Rutgers, 589 F.Supp. 479, 496 (D.N.J.1984)
 Appellants do not challenge this factual finding as clearly erroneous, nor does the majority dispute its accuracy. Thus, the majority begins with the unchallenged finding that "PIRG has a very substantial educational component," yet concludes, without overturning any factual finding, that PIRG's "educational benefits are only 'incidental.' " Majority at 1065. I do not believe that a fair reading of Galda I empowers us to so disregard the district court's factual finding regarding educational benefits. See infra pp. 1071-72.
 
 
 [2]
 In Robinson, we found support in Justice Harlan's opinion in Lathrop v. Donohue, 367 U.S. 820, 848, 81 S.Ct. 1826, 1840, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring). In that case, a lawyer challenged as "compelled association" the requirement that he pay dues to a bar association that lobbied for legislation that he believed was not in his interests. Justice Harlan found the situation clearly distinguishable from West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), where students were required to salute the flag against their will:
 What seems to me obvious is the large difference in degree between, on the one hand, being compelled to raise one's hand and recite a belief as one's own, and, on the other, being compelled to contribute dues to a bar association fund which is to be used in part to promote the expression of views in the name of the organization (not of the dues payer), which views may turn out to be contrary to the views of the dues payer.
 Id. 367 U.S. at 858, 81 S.Ct. at 1846. Justice Harlan found the difference in degree "so great as to amount to a difference in substance." Id. He pointed out that without a recognition of that difference, any taxpayer could object to his funds being used for military purposes, or for "school textbooks or instruction which he finds intellectually repulsive." Id. at 860, 81 S.Ct. at 1847. That, however, was not and is not the state of the law. See Hamilton v. Regents of Univ. of Cal., 293 U.S. 245, 268, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934); see also United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); Pruneyard Shopping Center v. Robins, 447 U.S. 74, 85-88, 100 S.Ct. 2035, 2042-2044, 64 L.Ed.2d 741 (1980).
 
 
 [3]
 In another school setting, this Court recognized the fundamental importance of limiting judicial intrusion in academic affairs. See Seyfried v. Walton, 668 F.2d 214, 216-17 (3d Cir.1981) (refusing to intervene where school superintendent suppressed speech based on sexual content, because "those responsible for directing a school's educational program must be allowed to decide how its limited resources can be best used to achieve the goals of educating and socializing its students"); see also American Future Systems v. The Pennsylvania State Univ., 752 F.2d 854, 870 (3d Cir.1984) (Adams, J., concurring)
 
 
 [4]
 The problem with the majority's exclusive emphasis on a group's political quality is that almost any group's objective, no matter how educational it may also be, can be characterized as political. "Virtually all educational decisions necessarily involve 'political' determinations." Board of Educ. v. Pico, 457 U.S. 853, 890, 102 S.Ct. 2799, 2820, 73 L.Ed.2d 435 (1982) (Burger, J., dissenting)
 The majority defines as political only those groups with "a frankly ideological bent." Majority at 1065. The difficulty with this definition was succinctly expressed by Judge Wright in Business Executives' Move for Vietnam Peace v. FCC, 450 F.2d 642, 661 (D.C.Cir.1971), rev'd sub nom. Columbia Broadcasting System, Inc. v. Democratic Nat. Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973):
 The line between ideological and nonideological presentations is an almost impossible one to draw. All too often in our society one particular ideology--that of passivity, acceptance of things as they are, and exhaltation of commercial values--is simply taken for granted, assumed to be a nonideology, and allowed to choke out all the rest.
 See also Lawrence Univ. Bicentennial Comm'n v. City of Appleton, 409 F.Supp. 1319, 1326 (E.D.Wis.1976).
 
 
 [5]
 The majority proposes two distinguishing factors: (1) PIRG is an independent "outside" organization, while student activity groups are "inside" the university; and (2) the university maintains control over the student groups funded through the general activities fee, and can therefore "insure a balance in access." Majority at 1067. The inside-outside distinction does not withstand scrutiny; certainly many student group activities will extend outside the university, and there is no university regulation, nor any First Amendment requirement, forbidding student groups from venturing beyond campus boundaries to further their interests or education, or from concerning themselves with effecting change outside the university. Under the majority approach, a human rights student group that takes a stand on apartheid would risk losing its funding. Student groups funded through the general activities fee at Rutgers include the Rutgers University Legislative Action Committee, which lobbies in Washington, D.C. and Trenton. 598 F.Supp. at 482. With respect to PIRG's "independence," there would appear to be no constitutionally significant difference between funding a local student chapter of the nationwide NAACP and funding a local board of New Jersey PIRG, whose membership extends only to university students across the state
 There is also no support in the record for the majority's second distinction. Indeed, the record demonstrates that the university has the capacity to keep tighter control on PIRG than on its internal student groups. PIRG is subject to triennial review before the university board and the general student body; other student groups do not answer to the university or to the student body as a whole. In addition, this distinction appears to be based on the notion that universities have a constitutional duty under the First Amendment to "insure a balanced approach." Id. at 1067. Thus, the majority concludes, "the objection to funding an outside activity is that the result achieved is not neutral." Id. at 1067. But it is only access that must be neutral, not results. Beyond the broadcast media context, attempts to exert government content control in order to achieve "balance" are prohibited by the First Amendment. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The university does not, and under the First Amendment probably may not, insure balance in the allocation of its general student activity fee, and thus the "quid pro quo" to which the majority refers simply does not exist under any funding program. See Majority at 1067.
 
 
 [6]
 The majority insists that it is not ordering PIRG silenced, but only demanding that it not be funded in this particular manner. But for First Amendment purposes, a cutoff in funding because of political content is just as impermissible as outright suppression. See Stanley v. Magrath, 719 F.2d 279 (8th Cir.1983) (university cannot change method of funding school newspaper on basis of newspaper's content). As the Court reiterated in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), involving the right of the Students for a Democratic Society to be officially recognized as a student group, "freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental influence." Id. at 183, 92 S.Ct. at 2347 (quoting Bates v. City of Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960))
 
 
 [7]
 While Abood guides us in considering the rights of students not to associate, it is important to note the differences between compulsory union dues and a mandatory student fee. See supra, Section II. The justification for compelling union dues was found in a legislative judgment that collective bargaining was crucial to labor peace. Abood, 431 U.S. at 224, 97 S.Ct. at 1794. The justification for compelling student fees in a university setting is found in the First Amendment itself, which protects a university's right to educate, and students' rights to be educated by exposure to diverse ideological viewpoints
 
 
 [8]
 "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), cited by both majority and concurrence in Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 176, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976)
 
 
 [9]
 See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Perry suggests that it is permissible to limit access on educational grounds, id., 103 S.Ct. at 955 n. 7, but Consolidated Edison suggests that it is not permissible to limit access on "political" grounds
 
 
 [10]
 The prima facie standard set out in Galda I is a litmus test, applicable to the specific facts presented by the Rutgers funding procedure, for identifying a potentially non-neutral access policy. The university's stated position holds out that any group which meets certain objective requirements showing substantial student support, and which is considered educational by the University Senate, will be funded. Under Galda I, if a participant in such a forum is shown to be "essentially a political action group with only an incidental educational component," a prima facie case is established, because such a showing suggests that the university is not in fact operating the forum on the legitimate terms that it has specified
 
 
 [11]
 The majority suggests that the democratic aspect of the neutral funding mechanism--requiring a showing of widespread student support prior to access--violates the First Amendment. While at some point a majoritarian requirement that effectively served to silence dissenters would violate the First Amendment, such a showing has not been made here. Thus, if the "neutral funding mechanism" were the only access route to the Rutgers University forum, the First Amendment might arguably be violated. So long as the university also provides access to its forum to minority voices, as it does here through the general activities fee program, however, it would not appear to violate the First Amendment simply to provide greater support through a separate mechanism to those groups commanding greater interest
 
 
 [12]
 It might be preferable if the term bill contained a statement noting that PIRG and the school newspaper are funded as participants in the university forum because they have satisfied the requirements of a neutral funding mechanism open to all applicants, and that no institutional support of its political viewpoints should be implied. If such a statement were added, there would not even be any superficial differences between the general student activities fees and the neutral funding mechanism fees
 
 
 [13]
 It is important to recognize the difference between "partisan" and "political" speech. Rutgers does discriminate against partisan speech, by prohibiting its funding. The Supreme Court has held that it is constitutionally legitimate to prohibit support of partisan activities by government bodies or employees. See United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); id. at 557, 561-62, 93 S.Ct. at 2886, 2888-89 (noting expressly that restrictions were limited to partisan political activity, and allowed employees to participate in all nonpartisan political activity); see also United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1947). Thus, the Democratic and Republican parties can and will be barred from access to the Rutgers forum, even though PIRG may not be barred
 
 
 [14]
 It has been estimated that approximately 90% of colleges appropriate money to student groups from mandatory fees or directly from their budget. D. Meabon, R. Alexander & T.F. Hunter, Student Activity Fees 20-33 (1979)